[No. B120795. Second Dist., Div. Two. Apr. 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
TASSAGE ELIZE, Defendant and Appellant.

**COUNSEL**

Walter L. Gordon III for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec, and Arthur H. Auerbach, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ZEBROWSKI, J.**—Defendant Tassage Elize worked as an armed security guard at a food market. He was apparently romantically involved with two

women simultaneously, one of whom was or had been pregnant with his child. Both women were physically larger than defendant. The women came to defendant's place of work together, and a violent altercation followed. At the conclusion of the altercation, defendant had a broken wrist and one shot had been fired from defendant's handgun. At a jury trial defendant was convicted of assault with a firearm on one woman (Pen. Code, § 245 subd. (a)(2)) and battery of the other (Pen. Code § 242.)[1] In addition, the jury found true an allegation that defendant personally used a firearm within the meaning of section 12022.5. The trial court sentenced defendant to the low term of 2 years for the assault with a firearm, the upper term of 10 years for the firearm use, a concurrent term of 18 months for the battery, and ordered a $10,000 payment to the state Victims' Restitution Fund plus $25 to one woman for a shirt that was perforated by the bullet.

Defendant now appeals on several grounds. One of these grounds is that the trial court refused to give instructions on self-defense that were requested by defense counsel. We will reverse on this ground, and hence need not consider the other grounds raised.

## I. THE EVIDENCE AT TRIAL.

The evidence at trial was confused and in conflict, as is not unusual. It can be summarized as follows.

An uninvolved witness in the parking lot testified that he observed a struggle between defendant, dressed as a security guard, and two ladies. According to this witness, defendant was trying to prevent one lady from closing her driver's side car door. The passenger then got out of the car and tried to push defendant away from the door. The driver then joined the struggle, and at various points defendant was seen choking one woman or the other. There was a lot of hollering, pushing and hitting, possibly including one of the woman hitting defendant with an object. He may have seen a large flashlight in the hands of one of the women. He did not see defendant pull his gun from its holster, but he saw the flash of a gun and heard its report. However, he could not see the gun itself. Both of the women then entered a car and left.

The bullet put two holes in a loose-fitting shirt worn by one of the women. That woman testified that defendant had been her boyfriend, and that they had lived together for nine and a half months before the incident in the parking lot. Several months before that, she had learned that defendant had been seeing the second woman, and had broken up with him, but later the

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

two got back together. The first woman was then contacted by the second woman, who explained that she was pregnant with defendant's child. Although defendant and the first woman continued to live in the same apartment, their relationship deteriorated. On the day in question, the second woman came to the first woman's apartment. She was upset. The two women talked, and decided to collect defendant's clothes, take them to his place of work, and deliver them to him. Upon arriving in the parking lot, they had defendant summoned. An argument, complete with accusations and denials, followed. At one point, defendant tried to prevent the first woman from closing her car door, and later choked the second woman. The first woman testified that she then beat defendant with her cellular phone. She testified that after she hit him across his back and neck, defendant pushed her away, pointed a gun at her, and fired towards her chest. She denied grabbing defendant's gun, or reaching for it, and also denied hitting defendant on or near his wrist. The two women then drove away. The first woman had a bullet hole in her shirt, but was uninjured.

Culver City Police Officer Rick Neilson testified that he responded to a call regarding an assault in progress, later upgraded to possible shots fired. Defendant was sitting just inside the market doors, wearing a security guard uniform. Officer Neilson examined defendant's .38-caliber revolver, finding that it contained one expended casing and a distinctive odor of gun powder, indicating it had been recently fired.[2] When Officer Neilson arrived, defendant was being treated by paramedics. He arrested defendant and transported him to a hospital, where his arm was treated by a doctor in the emergency room.

Officer Kirk Newman interviewed the first woman. He saw that her shirt had a hole in it, with a matching hole on the other side. He testified that both women were about five feet seven or eight inches in height and two hundred to two hundrend twenty pounds in weight. He did not see any observable physical injuries on either woman. He did not conduct a gunshot residue test on either woman.

A firearms investigator for the sheriff's department examined the first woman's shirt and defendant's handgun. He testified that there was an entrance bullet hole on the front side of the shirt and an exit bullet hole on the rear side of the shirt sleeve. He found the firearm to be in working order, and testified that even shooting from a short distance, a person could miss a target. He estimated that the gun was 36 to 42 inches or more away from the shirt when it was fired.

---

[2]As part of the defense, the quality control manager of the security firm defendant worked for testified that defendant had a permit to carry the weapon.

The second woman could not be located at the time of trial, and her testimony from the preliminary hearing was read into the record. She testified that defendant had been living with her on the day in question, but was seeing the first woman again. The two women then decided to go to the market to give defendant his clothes. The second woman testified that defendant tried to stop the first woman from closing her car door, telling her that he loved her, etc. The situation escalated to an altercation between defendant and both women, including hollering, choking, etc. The first woman began beating defendant with something. The second woman did not know what the object was, but understood that it was a phone. The second woman testified that defendant then shot at the first woman. The two women then entered a car and left the scene.

Defendant testified somewhat ambiguously about how long he had known the second woman, but stated that he was living with the first woman.[3] The second woman had driven him to work on the day in question. That evening, his manager called him and he went outside. The first woman was there, angry and yelling obscenities. She threw his keys on the ground, and when he went to pick them up, tried to run him over. He jumped away, and was not injured. He testified that the two women then exited the car, and that the first woman took two iron pipes from the trunk and gave one to the second woman. The first woman then asked him which woman he loved, and he replied that he did not like either. The two women then began beating him with the iron pipes, a blow from the first woman breaking his left wrist or arm. He testified that he grabbed the hand of the second woman, tearing the iron pipe out of her grasp while the first woman continued to beat him with her pipe. The second woman, having lost her pipe, then grabbed defendant's handgun from its holster. Defendant grabbed her hand while the first woman continued hitting him on the back and side. Defendant testified that he attempted to point the gun upward. The gun fired, and the two women left. Defendant then returned the handgun to its holster, ran inside, and told the manager to call the police. Paramedics arrived first and treated his arm; later the police took him to a hospital where he was fitted with a cast and a sling.

In rebuttal, Officer Nielsen testified to statements previously made by defendant. Officer Nielsen testified that defendant stated that one of the women grabbed his handgun and that it fired during the ensuing struggle. The officer also testified to some discrepancies in defendant's explanation of who was really his roommate, and that defendant had previously stated only that one of the woman had been hitting him with a pole. Officer Nielsen also stated that defendant had previously stated that it was the woman, and not defendant, who had pulled the trigger.

---

[3]Defendant is from Haiti, and his native language is Creole. A Creole interpreter was present at trial. The evidence showed that defendant spoke English, but with an accent.

## II. The Instruction Request.

During discussion of instructions, defense counsel requested instructions on self-defense, stating: "After some reflection I would ask the court to consider giving self-defense instructions . . . . I realize that there's been no testimony from the defendant that he specifically was acting in self-defense, however, I think these instructions relate to legal issues, [and that] the fact finder can make inferences [of self-defense.] . . . As the court knows, it seems to be uncontroverted that [defendant] suffered a broken arm during the incident. He testified it was a result of being hit by a pole and so for that reason, I'm asking the court to give self-defense instructions." The court denied the request, stating there was no factual basis for it because defendant had testified that the gun fired accidentally.

During its opening argument to the jury, the prosecution emphasized that self-defense was not an issue in the case, i.e., that defendant was not claiming that he shot in order to defend himself. Defense counsel also then argued that defendant did not say that he was trying to defend himself after one of the women broke his arm. Defense counsel instead argued that the shot was accidental.

Defendant was convicted and sentenced as noted above.

## III. The Court Erred in Refusing Instructions on Self-defense.

■■■ Defendant testified that the gun had fired accidentally. He did not testify that he intentionally fired in an effort to stop the attack which had broken his arm. The court refused the self-defense instructions precisely because defendant had testified that the firing was accidental, and had not testified that it was an effort at self-defense. A jury, however, could disbelieve defendant's testimony that the firing was accidental, and decide instead that he had fired intentionally, either actually attempting to hit one of the women or to shock them into breaking off their attack. In convicting defendant of assault with a firearm, the jury apparently did disbelieve defendant's testimony that the gun had fired accidentally, and apparently concluded instead that the firing was intentional. Having made the apparent determination that the firing was intentional, and having no instruction regarding an intentional firing in self-defense, the jury was deprived of any further alternative under the instructions given other than to convict. The question is whether the jury should have been given instructions which would have allowed the jury, after reaching its apparent conclusion that the firing was intentional, to consider whether the firing constituted justifiable self-defense.

In determining whether the trial court should have accepted the defense request to instruct on self-defense, we take guidance from the recent Supreme Court analysis in *People* v. *Breverman* (1998) 19 Cal.4th 142 [77 Cal.Rptr.2d 870, 960 P.2d 1094]. *Breverman* dealt specifically with the question of when the court must instruct sua sponte on lesser included offenses, rather than with the instant question of when the court must give an instruction that is expressly requested. However, the principles relied upon in *Breverman* and related cases, when applied to the issue presently before this court, lead to the conclusion that the requested self-defense instructions should have been given in this case.

In *Breverman*, the defendant shot at a gang of fleeing boys who had vandalized his car and threatened to break into his home. One of his shots killed one of the boys. The defendant testified that he had not aimed at any of the boys and had not intended to hit any of them. The question was whether the court should have instructed on heat of passion manslaughter, notwithstanding the defendant's testimony that he had not intended to shoot any of the boys. In answering the question in the affirmative, the *Breverman* court reviewed the governing principles.

The court noted that "[i]n [*People* v.] *Sedeno* [(1974)] 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], we noted that the sua sponte duty to instruct on all material issues presented by the evidence extends to *defenses* as well as to lesser included *offenses* . . . , but we drew a sharp distinction between the two situations. In the case of *defenses*, we concluded, a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' . . . Thus, when the trial court believes 'there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.' " (*People* v. *Breverman, supra,* 19 Cal.4th at p. 157, some italics omitted.) In applying this passage to the instant case, a point of unclarity becomes apparent. It is not clear what the Supreme Court meant in stating that a defendant is "relying" on a defense or in referring to a "defendant's theory of the case." In the instant case, the defense counsel attempted to raise the defense of self-defense, since it was so amply supported in the record. The trial court, however, precluded defense counsel from advancing that defense because of defendant's testimony that the gun had fired accidentally during the struggle. Thus if the nature of defendant's testimony is what the Supreme Court had in mind in its references to "relying" and "defendant's theory of the case," then it would be correct that the trial court in the instant case had

no sua sponte duty to instruct on self-defense. However, even if that is correct, according to *Breverman*'s quotation from *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], the trial court in the instant case should have ascertained from defense counsel whether he wished "instructions on the alternative theory" of self-defense. It is necessarily implicit in *Breverman*'s and *Sedeno*'s directive that the trial court should make such an ascertainment that the trial court should instruct "on the alternative theory" when the defense so requests. Here, the trial court was not put to the test of "ascertaining" whether defendant wished a self-defense instruction. Instead, defendant expressly asked for the instruction.

*Breverman* continued its analysis by referring to *People* v. *Barton* (1995) 12 Cal.4th 186 [47 Cal.Rptr.2d 569, 906 P.2d 531], in which the "instructional distinction between *defenses* and lesser included *offenses*" again arose. (*People* v. *Breverman*, *supra*, 19 Cal.4th at p. 157.) *Barton* also involved a homicide, one in which the defendant claimed to have fired his gun accidentally. (See also *Barton*, *supra*, 12 Cal.4th at pp. 192-193 ["Defendant, testifying on his own behalf, claimed that the shooting was an accident. . . . Defendant denied any intent to shoot."].) Defense counsel in *Barton* specifically requested that no instructions be given on heat of passion manslaughter. The trial court nevertheless instructed on heat of passion manslaughter, because substantial evidence supported that lesser included offense. The Supreme Court in *Barton* affirmed, stating that " '[t]he trial court must instruct on lesser included offenses . . . [supported by the evidence] . . . , regardless of the theories of the case proferred by the parties.' " (*Breverman*, *supra*, 19 Cal.4th at p. 159.) This conclusion was based on the underlying principle that ". . . the jury must be allowed to 'consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties,' so as to 'ensure that the verdict is no harsher or more lenient than the evidence merits.' " (*Id.* at p. 160.)

Returning to a consideration of how these principles might apply to the instant case, it is clear that had the shot in question hit and killed one of the women, and had defendant been charged with murder, the trial court would not only have had a duty, but indeed a sua sponte duty, to instruct on both heat of passion and unreasonable self-defense manslaughter notwithstanding defendant's claim that the gun fired accidentally. The fact that defendant testified that the shot was accidental would not have precluded a sua sponte duty to instruct on the lesser included offenses, as *Barton* makes clear. It is clear that inconsistency between an instruction and a defendant's testimony is no reason to refuse an instruction, so long as substantial evidence supports the instruction, at least in the case of lesser included offenses.

The purpose of the sua sponte instructional rule which applies to lesser included offenses is "to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence." (*People* v. *Breverman, supra,* 19 Cal.4th at p. 161.) Thus *Breverman* reaffirmed that the court must instruct on all lesser included offenses which are supported by substantial evidence in the record. In making the decision of whether a record contains substantial evidence, *Breverman* makes clear that ". . . courts should not evaluate the credibility of witnesses, a task for the jury." (*Id.* at p. 162.) The court stated that "substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Id.* at p. 162-163.) The court emphasized that "[t]his means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental . . . . For example, in *Barton* . . . we concluded that when a killing occurred during a heated argument, which itself shortly followed an 'upset[ting]' traffic incident between the victim and the defendant's daughter, there was substantial evidence of heat of passion despite the defendant's insistence that he sought only to detain the victim and fired his weapon accidentally. . . ." (*Breverman, supra,* 19 Cal.4th at p. 163, fn. 10.)

Returning to the facts involved in *Breverman,* the *Breverman* court concluded that ". . . even though defendant insisted in his police statement that he did not 'aim[]' or fire 'at them,' a jury could reasonably disbelieve that claim and conclude, from all the evidence, that defendant killed intentionally, but while his judgment was obscured due to passion aroused by sufficient provocation." (*People* v. *Breverman, supra,* 19 Cal.4th at p. 164.)

The *Sedeno* opinion contains a seemingly inconsistent dictum, and also some pertinent guidance in addition to those portions of *Sedeno* discussed in *Breverman.* In *Sedeno,* a mentally disturbed man was attempting to escape police custody, and the police were attempting to subdue the man. The man seized an officer's gun and shot and killed the officer. He was convicted of first degree murder. On appeal, he contended (among other things) that the trial court should have instructed, sua sponte, on the defenses of unconsciousness and self-defense. The issue thus was the scope of the trial court's duty to instruct sua sponte, not whether the trial court should have given an expressly requested instruction.

The opinion in *Sedeno* appears either internally contradictory or outmoded in several respects. In discussing the defense of unconsciousness, *Sedeno*

states "[i]t appears . . . that there was no substantial evidence to warrant giving instructions on [unconsciousness]" and that the theory of unconsciousness was "inconsistent with the accidental death defense asserted by defendant." (*People* v. *Sedeno, supra*, 10 Cal.3d 703, 717.) However, the court went on to state that "[d]efendant apparently relies on the evidence that he had been struck on the head and staggered as the basis for an inference that his subsequent acts were not volitional in that he had been unconscious when he shot Officer Klass. *Had he expressly relied on this defense and requested an instruction thereon, we would be forced to conclude that the evidence was sufficient to entitle him to the instruction.*" (*Ibid.*, italics added.) Thus notwithstanding that *Sedeno* initially states that there was no substantial evidence to support a defense of unconsciousness, it nevertheless found that the evidence was sufficient to require instructions on the defense of unconsciousness, and opined that such an instruction should have been given if the defendant had asked for it, even though inconsistent with his defense of accident. In the instant case, of course, defendant did ask for the self-defense instruction. Thus notwithstanding any obsolescence or internal inconsistency in *Sedeno*, even *Sedeno* expressly states that when evidence supports a defense and the defendant "relies" on that defense and requests an instruction on it, the instruction should be given.

*Sedeno* went on to reject the companion contention that an instruction should have been given on self-defense. The context of *Sedeno* was an attempted escape involving an attempt by police officers to subdue the would-be escapee. Hence the factual context was far different from that in the instant case. The circumstance of an attempted escape, in which the escapee disarms and shoots an officer attempting to prevent the escape, is hardly conducive to a defense of self-defense, at least absent some unusual circumstances not present in *Sedeno*. The *Sedeno* opinion began its discussion of this subject by stating "that there was no substantial evidence to warrant giving instructions on" the defense of self-defense. Just as was the case with regard to the defense of unconsciousness, *Sedeno* nevertheless went on to consider further the defendant's contention. that instructions should have been given on self-defense, but not surprisingly—in view of the factual context—rejected it. However, the language used by *Sedeno* in rejecting the contention, taken out of its context and imported into the instant factual scenario, would support affirming the trial court's refusal of self-defense instructions in the instant case. In considering whether the factual scenario in *Sedeno* raised a sua sponte duty to instruct, *Sedeno* commented on a different issue, stating in dictum that "[i]t is not error to refuse *a request* for instructions on self-defense when there is no evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands

of the victim, *or when the defendant has denied acting in self-defense and claimed the death was accidental.*" (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 718, italics added.) There had been no request for a self-defense instruction in *Sedeno,* and hence there was no need for the *Sedeno* court to decide the effect of a hypothetical request. Nevertheless, this dictum from *Sedeno,* if applied literally, would appear by way of analogy to require approval of the trial court's refusal to instruct on self-defense in the instant case. (See also *People* v. *Curtis* (1994) 30 Cal.App.4th 1337, 1357-1358 [37 Cal.Rptr.2d 304].) Affirming the refusal in the instant case, however, would be inconsistent with the principles on which the current state of the case law in this area is constructed.

From *Breverman, Barton* and the portions of *Sedeno* cited with approval in *Breverman,* we can glean several instructive points. First, a lesser included instruction is required even though the factual premise underlying the instruction is contrary to the defendant's own testimony, so long as there is substantial evidence in the entire record to support that premise. Thus, for example, an instruction on heat of passion manslaughter is required even though the defendant testifies that he had no intent to shoot and that the shot was accidental. Second, the rules regarding when a trial court has a sua sponte duty to instruct differ according to whether the instruction relates to a lesser included offense or to a defense. As to lesser included offenses, the court must instruct, as noted above, whenever there is substantial evidence to support the instruction. As to defenses, such as self-defense, the court must instruct sua sponte only if there is substantial evidence of the defense and the defense is not "inconsistent with defendant's theory of the case." (*People* v. *Breverman, supra,* 19 Cal.4th 142 at p. 157, quoting from *Sedeno.*) Third, in the event that there is substantial evidence of a defense inconsistent with the defense advanced by the defendant, the court should ascertain whether the defendant wants instructions on the alternate theory. Implicit in this proposition is the corollary that the court should give the instruction on the alternate defense if the defendant so requests upon being asked by the court. It seems to follow that the court should also give the instruction on the alternate defense without the middle step of the court asking in order to "ascertain" whether the defendant wants the alternate defense instruction, if the defendant simply requests the instruction expressly. Fourth, in determining whether the record contains substantial evidence of a lesser included offense, the court should not consider the credibility of witnesses, instead leaving credibility determinations for the jury. Although this substantial evidence point was made with respect to lesser included offenses, no reason has been suggested why the law of substantial evidence is any different in the case of defenses.

In the instant case, a jury could find from the evidence presented that defendant was sought out and attacked by two angry women much larger

than he, that he was being beaten with pipes, that this beating accounted for his broken wrist, that one of the women tried to take his handgun, and that he struggled with that woman while the other continued to beat him. A jury could disbelieve defendant's testimony that the gun fired accidentally during this struggle. A jury could find that defendant fired the gun intentionally, hoping to end the attack upon him either by hitting one of his assailants or by firing into the air to scare off his attackers.

The question thus resolves into whether we should apply the principles set forth in the recent cases of *Barton* and *Breverman* to the instant situation, or whether we should literally apply the dictum from *Sedeno*, in a situation that presents the disturbing possibility that justice has miscarried. Since the issue of sua sponte duty or not has no place in this case, we rely on the general principles that the trial court has a duty to instruct on all material issues presented by the evidence and that ". . . the jury must be allowed to 'consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties,' so as to '*ensure* that the verdict is no harsher or more lenient than the evidence merits.'" (*People* v. *Breverman*, *supra*, 19 Cal.4th at p. 160.) While the scope of the court's duty to instruct varies as between lesser included offenses and defenses, and while it is sua sponte in some instances and only upon request in others, in the instant case the request was made. Whether the gun was fired in self-defense was a material issue presented by the evidence. Instructions were necessary to allow the jury to consider this key issue to "'ensure* that the verdict is no harsher or more lenient than the evidence merits.'" (*Ibid*.) Although defendant could have forfeited his right to such instructions by failing to raise the issue (since only a defense, and not a lesser included offense, was involved), defendant did not fail to raise it. Hence the trial court should have allowed the jury to determine the self-defense issue by instructing upon it when requested.

We cannot conclude that the court's refusal to instruct on self-defense was harmless. In *Breverman*, the Supreme Court rejected the previous strict standard for review of instructional error, and adopted the *Watson*[4] standard, at least insofar as instructional error relating to lesser included offenses is concerned. Even assuming that the less-stringent *Watson* test applies here, the error was nevertheless prejudicial. Examining the entire record of this case leaves one with the distinct impression that it is reasonably possible that defendant would have obtained a more favorable outcome if the jury had been permitted to consider whether defendant fired the gun in self-defense. Accordingly, we must reverse.

[4]*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

## IV. DISPOSITION.

The judgment of conviction is reversed.

Nott, Acting P. J., and Mallano, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.