Filed 7/15/13  P. v. Amos CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DOMINIQUE AMOS,<br><br>    Defendant and Appellant. | C068783<br><br>(Super. Ct. No. 10F00429) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONNIE BROWN III,<br><br>    Defendant and Appellant. | C068784<br><br>(Super. Ct. No. 10F00429) |

Gunfire erupted at an apartment building, killing two people and injuring another. An information charged defendants Dominique Amos and Ronnie Brown III with two

1

counts of murder and one count of attempted murder. (Pen. Code, §§ 187, subd. (a), 664/187, subd. (a).)[1] Brown and Amos were tried by separate juries. Brown's jury found him not guilty of first degree murder but guilty of second degree murder and not guilty of attempted murder. Amos's jury found him not guilty of first degree murder but guilty of second degree murder and guilty of attempted murder. The court sentenced Amos to 105 years to life in state prison and Brown to 80 years to life. Amos and Brown appeal, arguing the court erred in failing to instruct on self-defense and imperfect self-defense. Amos also argues sentencing error. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the aftermath of gunfire, Eleea Langley and Marcus Thompson lay dead; Jose Martinez suffered gunshot wounds. An information charged Amos and Brown with the murders of Langley and Thompson and the attempted murder of Martinez. In association with these counts, the information alleged Amos and Brown used and personally discharged a firearm. (§ 12022.53, subds. (b), (c), & (d).) In connection with the murder counts, the information alleged Amos and Brown had committed multiple murders, a special circumstance.

Separate juries were impaneled to try defendants. The following evidence was introduced at trial.

**The Shooting**

*Tonisha Choyce's Testimony*

In January 2010 Tonisha Choyce lived in apartment No. 11 in a Sacramento apartment complex. On the evening of January 14, 2010, Choyce was in her kitchen and saw five people leaving the apartment building through the rear. Choyce recognized a man and a woman among the group as residents of an upstairs apartment. The others in

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

the group were two men and a woman. The two men wore dark "hoodies," pulled up, and jeans.

A few minutes later, Choyce saw the two men in the hoodies return to the apartments and begin shooting. Choyce closed her kitchen window and ran. Choyce heard many shots but could not recall exactly how many.

Choyce estimated there were at least 12 men outside the apartments during the shooting. Most of them were in front of the complex; some sat on the stairs. Among the men, Choyce recognized Martinez, Thompson, and Langley.[2]

Choyce testified her cousin is a man who goes by the name of "Little." She did not see Little outside during the shooting, but she had seen him earlier that day.

A few days before the shooting, Choyce witnessed an argument between the woman who lived in apartment No. 47, which was upstairs and to the left of Choyce's apartment, and Choyce's cousin Talisha. The fight became physical and other people joined in the fray, but Choyce did not see Little draw a gun at any point during the fight. One woman hit another on the head with a skateboard. Although a great deal of yelling ensued, Choyce did not hear any threats being made.

### Jose Martinez's Testimony

The evening of the shooting, Jose Martinez stood in front of an apartment complex talking with a friend, Marcus Thompson. Martinez heard gunshots. He believed they came from the direction of a park or schoolyard to the left of where he stood. Martinez heard more shots and realized they were coming from behind him.

Martinez dropped to the ground and landed on Thompson. After crawling behind and over some bushes, Martinez got up and ran toward his apartment. As he looked

---

[2] Choyce identified Langley as "Rock," the name Hozie Ross gave Langley.

back, Martinez saw Langley stumbling and holding his side. Gunfire continued and Martinez kept running. Martinez heard approximately 20 shots.

Martinez's arm began to burn and he realized he had been shot in the elbow. He ran home and told his mother he had been shot. Martinez later returned to the apartment building and saw Thompson on a stretcher.

During cross-examination, Martinez testified that on the day of the shooting, he had seen a man known as "Little" near the apartments. However, he did not see Little when the shooting occurred.

### *Hozie Ross's Testimony*

The afternoon of the shooting, Hozie Ross and Langley played video games for a few hours at the apartment complex. Later they walked outside toward the apartment hallway. Langley waited for his girlfriend to arrive and chatted with Ross for about 15 minutes.

While they talked, Ross saw three people in front of the apartments. Without warning, bullets began whizzing by and Ross heard multiple shots coming from behind him. Ross and Langley began to run through the hallway. When Ross circled back around, he found Langley bleeding from his stomach and Thompson struggling to breathe.

### *Qualisha Church's Testimony*

In January 2010 Qualisha Church lived in apartment No. 47. She is defendant Brown's sister and defendant Amos's cousin. At that time, Church had a boyfriend named Eric Broussard, who lived with her.

Church has a twin sister named Talisha. Church and Talisha were involved in a fight at the apartment building prior to the shooting. The fight broke out after Broussard choked one of the little boys who lived in the apartment complex. The boy and his friend were throwing something at Church's window and threw rocks at Broussard. Broussard grabbed the boy and choked him.

4

A woman came to Church's apartment to ask about the incident. Church explained the matter had been resolved, but the following day a woman said that Broussard had "mugged" her.

The next day Church found several people near her apartment, including a woman who wanted to fight her. Church asked her sister to come over, and the two women went outside and fought with two other women.

As the fight went on, Little threw Church to the ground and pointed a gun at Church and Talisha. After the fight ended, Church returned to her apartment. Thompson and Langley were not present at the fight.

Church received an eviction notice the next day. The apartment manager told her it was only a warning, but Church decided to move. Defendant Brown provided transportation to Church and Broussard as Church began to move out. Church told Brown about her fight and that someone was threatening to shoot at her apartment.

The evening of the shooting, Amos and Brown picked up Church, Broussard, and Church's friend Ariel Brown and drove to the apartment to pick up clothes. Amos and Brown wore jeans and hooded sweatshirts. Church believed their sweatshirts were black or dark grey. Amos parked at the rear of the apartments, and he and his passengers walked toward Church's apartment.

Church saw two people in the area. Church and the others stayed in her apartment for about 10 minutes before loading the car. They got in the car and noticed a "whole bunch" of people around the apartment building who had not been there when Church and her group first arrived. Amos and Brown got out of the car and walked through a hallway in the complex.

Church heard many gunshots. After the shooting ceased, Amos and Brown returned to the car and they drove away. Amos and Brown seemed worried.

5

### *Ariel Brown's Testimony*

Ariel Brown, a friend of Church, testified she had met Brown twice and Amos once. The evening of the shooting, Amos and Brown drove Ariel, Church, and Broussard to the apartment complex. Church told the driver, either Amos or Brown, to drive to the back of the apartment complex in case something happened. Everyone got out of the car and went to Church's apartment, where they bagged up Church's belongings and took them down to the car.

As the group walked toward the car, a man Ariel could not identify was "talking mess," apparently making comments about Church and her companions. Amos or Brown said, "I feel like I got played" and returned to the apartments. Minutes later, after losing sight of Amos and Brown, Ariel heard numerous shots. Ariel saw many men in the area.

Amos and Brown returned to the car, walking quickly. Ariel asked them if they had heard the gunfire. The group then drove to Ariel's brother's home; Amos and Brown said they were returning home.

### *Eric Broussard's Testimony*

A few days before the incident, Broussard saw a six- or seven-year-old boy and the boy's friend attempt to break Church's apartment window. The boy then threw a football at Broussard, and both boys threw rocks at him. Broussard told the boys to stop. He later discovered that Little and the six- or seven-year-old boy were cousins.

The boy who was Little's cousin kicked Broussard and socked him in the chest. Broussard laughed and the boy socked Broussard in the chin, then tried to hit him again. Broussard grabbed the boy by the shirt. After the boy's mother confronted him, Broussard apologized. The mother asked Broussard to come to her place to discuss matters in the future or her cousins would come over and "handle it." During their talk, Broussard saw Little downstairs. Broussard believed the matter had been resolved.

The next day, Church and Broussard encountered a woman related to one of the tenants. She asked Church, "What are you looking at?" and said "You don't want it." Broussard believed these were "fighting words."

Suddenly, Little began walking toward them as they entered Church's apartment. Broussard looked out and saw Little looking up at the apartment. Little said something like, "if you're not out by tonight, then we are going to get you out."

That night a fight broke out between Church and the relatives of the downstairs neighbors. Broussard saw Little waving a gun in front of the apartment building the morning after the fight. Little looked toward Church's apartment and said something about getting them that night. Although Broussard called the police, they were unable to find Little.

Broussard accompanied Brown, Amos, Church, and Ariel Brown to Church's apartment the night of the shooting. To avoid any problems, Amos parked at the rear of the apartment building. As they left the apartment, Broussard saw between 20 and 30 people near the apartment mailboxes and two people near the rear of the building where the car was parked.

As they walked, Broussard heard someone in the group yell, "[A]in't no scary people over here, . . . ya'll [*sic*] scary. You all some punks. Ain't no punks over here." Amos and Brown got out of the car. As they walked back to the car, Broussard heard shots. The group left the apartment building.

Later a detective interviewed Broussard. Broussard told the detective that Amos and Brown were not involved in the shooting because they had been with him the entire time.

**Subsequent Investigation**

When officers arrived at the scene, they found Langley lying outside the apartment complex. They also found Thompson lying on the ground nearby. Although Thompson

7

was conscious, he would not answer questions. A subsequent police diagram of the scene showed several bullet holes in apartment No. 5.

Two days after the incident, Detective Belli recorded an interview with Church. Church recounted the trip to the apartment with Broussard, Ariel Brown, and defendants. When defendant Brown returned to the car, he said they had "been played." Church told defendants not to "do anything dumb." Church saw Brown and Amos run back to the car after she heard the shots. They were out of breath when they got back to the car. Church asked Belli not to relay that she had given him this information, since she was Brown's sister and "it was just going to come back to her."

In an interview with a detective, Ariel Brown recounted traveling to the apartment building with the group the night of the shooting. As the group walked back to the car, some girls made comments to them. Defendants left the car and ran back a few minutes later.

Officers collected spent cartridge casings in the apartment building's courtyard. They also found casings in a planter on the west side of the building's south entrance and spent bullets throughout the complex. In apartment No. 5, an officer found chips and holes in the stucco, and there was a hole and some "spidering" in the front window. The officer found a bullet on the floor.

An autopsy determined Thompson died from a gunshot wound to the abdomen. Langley suffered five gunshot wounds and died from a wound to the chest.

**Amos's Defense**

Amos's mother, who was also Brown's aunt, testified that she spoke with Amos on the night of the shooting. She spoke with him by phone between 8:00 and 9:00 p.m., and he was barbecuing at home. On cross-examination, she testified she called Amos at 5:46 p.m. At that time, Amos was living with Alisha Breuker, with whom he had a son.

8

Jessica Breuker, Alisha's sister, lived with the couple and other family members. The night of the shooting they had a barbecue. Jessica remained until sometime after 8:00 p.m. and did not recall Amos leaving while she was there.

Alisha, who subsequently ended her relationship with Amos, testified that the day of the shooting the family had a barbecue. Alisha looked at the clock when she served Amos dinner and noted it was 9:38 p.m. Amos spent the night at the house.

Amos testified in his own defense. He spent the morning of the shooting preparing his resume and filling out job applications. He returned home around 5:00 p.m. and looked after the children while Alisha barbecued. Amos ate dinner around 9:00 or 9:30 p.m. and spent the night at the house. The only time Amos had been in Brown's car was Christmas 2009. At that time he touched some compact discs and other things in the car.[3]

**Brown's Defense**

Brown introduced testimony by an emergency room nurse who treated Thompson the night of the shooting. The nurse found a bag of bullets between Thompson's legs while he was in the trauma unit. The nurse turned the bag over to a sheriff's deputy.

The deputy who received the bullets testified that after he arrived at the hospital the evening of the shooting, a nurse gave him a bag containing a box of live ammunition: 25 rounds of nine-millimeter Luger ammunition.

**Verdict and Sentencing**

Amos's jury found him not guilty of first degree murder in counts one and two, but guilty of second degree murder in each count. The jury also found Amos guilty of attempted murder in count three. For all three counts, the jury found Amos had

---

[3] A search of Brown's car after the shooting revealed Amos's fingerprints on a piece of notebook paper and a compact disc.

personally used and intentionally discharged a firearm, causing great bodily injury or death, within the meaning of section 12022.53.

Brown's jury found him not guilty of first degree murder in counts one and two, but guilty of second degree murder in each count. As to counts one and two, the jury found Brown had personally used and intentionally discharged a firearm, causing great bodily injury or death, within the meaning of section 12022.53. The jury found Brown not guilty of attempted murder as charged in count three.

The court sentenced Amos to a total indeterminate term of 105 years to life in state prison: consecutive 15-years-to-life sentences on counts one and two, and consecutive 25-years-to-life sentences on each of the three section 12022.53, subdivision (d) allegations that Amos discharged a firearm. The court also sentenced Amos to a consecutive determinate seven-year term on count three.

The court sentenced Brown to a total indeterminate term of 80 years to life in prison: consecutive 15-years-to-life sentences on counts one and two, and consecutive 25-years-to-life sentences on each of the two section 12022.53, subdivision (d) allegations that Brown used a firearm.

Defendants filed timely notices of appeal.

## DISCUSSION

### Instructional Error

At the outset, both defendants argue the court erred in refusing requested instructions on self-defense and imperfect self-defense. This omission, defendants contend, was prejudicial because evidence existed that would have supported acquittal based on self-defense or a finding of voluntary manslaughter based on imperfect self-defense.

### Background

During trial, Brown's counsel requested instructions on justifiable homicide, self-defense, and imperfect self-defense. Amos's counsel joined the request.

10

In support of the request, defense counsel referred to the melee at the apartment building a few days before the shooting. During the altercation, Little pointed a gun at Church and threatened to shoot up her apartment. On the day of the shooting, a group gathered and people in the group made what might have been threatening or hostile comments toward defendants and their companions.

Defense counsel also pointed out one of the shooting victims, Thompson, wore a shirt showing two handguns and the word "Ruthless." Thompson also was in possession of a box of nine-millimeter ammunition, and a nine-millimeter casing was found in the area. In addition, counsel noted that Jose Martinez testified he believed the first shot had come from a different direction from the others, a direction which was not where officers discovered the casings.

This evidence, defense counsel argued, supported an inference that defendants encountered an angry and hostile mob when they entered the apartment courtyard. The hostile mob included at least one armed individual who either flashed a firearm or threatened defendants, causing them to shoot at the group.

The prosecution countered that no evidence supported the instructions and the request was based on speculation. The prosecution noted Martinez testified he heard a shot that appeared to come from a nearby park but also testified he had no idea where the shot had come from.

The trial court denied the request, finding no substantial evidence to support the requested instructions. As for the shell casing, the court reasoned it could have been kicked or moved by anyone in the area following the shooting. The court also noted Martinez was mistaken about the direction he initially thought the first shot came from and subsequently realized the shot came from inside the apartment complex through the breezeway. After finding a total absence of any evidence other than speculation to support self-defense, the court denied the request but offered defense counsel the

11

opportunity to reopen to call witnesses who could establish facts to support giving the instruction. Defense counsel declined the offer.

**Discussion**

The trial court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) Before giving an instruction, the court must find legally sufficient evidence in the record to support the finding or inference that the instruction permits. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.)

We review the court's ruling on instructions de novo, independently reviewing the record when the trial court refuses an instruction requested by the defense based on a lack of substantial evidence. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581-584.) We uphold the trial court's ruling unless the record contains substantial evidence to support the requested instruction. (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269-1270.)

For a killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend against imminent danger or death or great bodily injury. However, self-defense may not be invoked by a defendant who, through wrongful conduct, creates the circumstances under which an adversary's attack is legally justified. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

When a defendant has an actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, that belief may negate the malice aforethought element of murder. Such a belief defines imperfect self-defense. (*People v. Rogers* (2006) 39 Cal.4th 826, 883.) Imperfect self-defense is a description of one type of voluntary manslaughter but is not an affirmative defense. (*People v. Cruz* (2008) 44 Cal.4th 636, 664; *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

12

A defendant may present alternate defenses. If substantial evidence supports a theory of self-defense inconsistent with the defendant's testimony, the trial court must determine whether the defense desires such an instruction. If substantial evidence exists and the defense requests the instruction, the court must so instruct. (*People v. Breverman* (1998) 19 Cal.4th 142, 157; *People v. Elize* (1999) 71 Cal.App.4th 605, 611-615 (*Elize*).)

Amos presented an alibi defense to the charges. However, Amos's defense counsel also argued the evidence supported a finding that the shooter was provoked or acted in self-defense. Defense counsel pointed out that a box of nine-millimeter bullets was found near Thompson and Martinez's testimony that he thought the first shot came from a different location than the other shots. Brown's defense counsel presented witnesses who testified that a box of ammunition was found between Thompson's legs.

Defendants argue there was substantial evidence that a properly instructed jury could have used to find either self-defense or imperfect self-defense on the part of defendants. According to defendants, evidence revealed they faced an angry and threatening crowd and that someone might have fired at them. Defendants fault the trial court for denying them the instructions based on the lack of direct testimony in support of the self-defense theory.

However, the trial court did not refuse to instruct on self-defense or imperfect self-defense because defendants failed to present direct testimony to support the instructions. Instead, the court considered the evidence defendants presented and found it lacking. We agree with the court's assessment.

Martinez testified he was standing in front of the apartments with Thompson when gunshots rang out. At first, Martinez thought the gunshots came from a park to the left of where he stood. However, on cross-examination, Martinez stated his reference to a park was to a grassy area bordering the school yard. On redirect, Martinez testified he had no idea from which direction the initial gunshot came. Martinez heard more gunshots and realized they were coming from behind him.

13

Martinez could not see who was shooting and fell to the ground, landing on Thompson. He crawled away and ran toward the apartment. In the process, Martinez was shot in the elbow. As he looked back, Martinez saw Langley stumbling and holding his side. Gunshots continued to ring out and Martinez continued to run.

Nothing in Martinez's testimony supports defendants' claim that they fired back in self-defense against an angry mob. Martinez did not see anyone at the apartment complex who was armed or threatening.

Ross testified he and Langley stood by the apartment mailboxes 15 to 20 minutes before the shooting. He saw three people in front of the apartments. Suddenly gunfire rang out, and Ross heard bullets coming from behind him. Ross and Langley ran. They split up, and Ross later found Langley bleeding from his stomach and Thompson struggling to breathe.

Ross did not observe any angry groups of people outside the complex. Nor did Ross describe any provocative acts directed toward defendants.

Choyce, an apartment resident, testified that a few minutes after she saw a group of five walk past her apartment, she saw two men wearing hoodies return to the apartments and begin shooting. Choyce estimated that at least 12 people were outside the apartment, most near the mailboxes. Choyce did not testify as to any provocation or altercation between groups of people; nothing in her testimony supports defendants' assertion of self-defense.

Nor did the testimony of defendants' companions support the giving of self-defense instructions. Church and Broussard described the altercation between apartment residents in the days before the shooting. Broussard also testified regarding Little's provocative statements aimed at Church.

On the evening of the shooting, the group went to retrieve items from Church's apartment. When they walked back to the car, Ariel Brown heard a man "talking mess," apparently about Church and her group. Broussard heard someone in the group yell,

14

"[A]in't no scary people over here, . . . ya'll [*sic*] scary. You all some punks. Ain't no punks over here." The group returned to the car, where they remained seated for a moment. Defendants got out of the car and walked through the apartment hallway. Shots rang out, and after the gunfire stopped, defendants walked back to the car and the group left. Defendants appeared worried when they returned.

Except for the brief mention of some of the people at the apartment complex making provocative comments, nothing in the testimony of the group that accompanied defendants the night of the shooting argues for a self-defense or imperfect self-defense instruction. As the trial court recognized, there has to be substantial evidence from which a reasonable jury could find facts underlying the instruction to be true. Here, defendants point to evidence that might have led to an altercation, but no evidence that such an altercation in fact occurred.

We find *Elize*, *supra*, 71 Cal.App.4th 605, relied on by defendants, distinguishable. In *Elize*, the defendant, working as a security guard, got into a fight with two of his girlfriends. They came to his workplace and began beating him with pipes, causing his gun to discharge accidentally. The trial court declined to give a self-defense instruction, since the defendant argued the shooting was accidental. The appellate court reversed. (*Id.* at pp. 606-610.)

The court in *Elize* found the jury could have found the defendant did not fire the gun accidentally but instead fired it intentionally to bring an end to the attack by his girlfriends. (*Elize, supra,* 71 Cal.App.4th at pp. 615-616.) In *Elize*, the evidence revealed a violent altercation between the defendant and the victim, culminating in a shooting. No such evidence of any altercation appears in the present case. The court did not err in declining to instruct on self-defense or imperfect self-defense.

### Sentencing Error

Amos argues the trial court's sentence of 25 years to life added to the two murder counts under section 12022.53, subdivision (d) violates the principles of double jeopardy.

According to Amos, the trial court relied on the same fact pertaining to both the murder and the enhancement.

**Background**

The jury found Amos not guilty of first degree murder in counts one and two, but guilty of second degree murder in each count. The jury found Amos guilty of attempted murder in count three. For all three counts, the jury found Amos personally used and intentionally discharged a firearm, causing great bodily injury or death. The court sentenced Amos to a total indeterminate prison term of 105 years to life: consecutive sentences of 15 years to life for counts one and two, and consecutive sentences of 25 years to life on each of the three allegations that Amos personally used and intentionally discharged a firearm. (§ 12022.53, subds. (b), (c) & (d).) The court also sentenced Amos to a consecutive seven-year term on count three.

**Discussion**

Amos concedes the Supreme Court declined to hold that enhancements are elements of the offense for purposes of the rule prohibiting multiple convictions based on lesser included offenses in *People v. Sloan* (2007) 42 Cal.4th 110 (*Sloan*) and *People v. Izaguirre* (2007) 42 Cal.4th 126 (*Izaguirre*). However, Amos argues these cases conflict with principles of double jeopardy and his sentences for counts one and two should not have been enhanced under section 12022.53.

In *Sloan*, the Supreme Court directly addressed double jeopardy concerns, finding double jeopardy protects against second prosecutions after an acquittal or for second prosecutions for the same offense after conviction. (*Sloan, supra,* 42 Cal.4th at pp. 120-121.) However, these categories of protection "are clearly not implicated here because we are directly concerned only with multiple convictions in a unitary trial, not multiple punishments in successive unrelated criminal proceedings." (*Id.* at p. 121.) The court in *Izaguirre* also rejected a double jeopardy challenge to firearm enhancements. (*Izaguirre*,

16

*supra*, 42 Cal.4th at p. 133.)  We are bound by these rulings.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### Custody Credits

Finally, Amos contends the abstract of judgment should be corrected to show credit for the 545 days he spent in presentence custody.  According to Amos, the credit is listed on the determinate abstract of judgment but not on the indeterminate abstract of judgment.  Amos requests that we correct the indeterminate abstract of judgment.

**Background**

The court sentenced Amos to a indeterminate prison term of 105 years to life: consecutive 15-years-to-life sentences on counts one and two, and consecutive 25-years-to-life sentences on each of the three allegations that Amos used a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d).  The court also sentenced Amos to a consecutive determinate seven-year term on count three.

The court awarded Amos 545 days of custody credit to be applied to the determinate seven-year sentence for count three.  However, the court awarded zero presentence credits on counts one and two.

Amos's appellate counsel submitted a written request to the trial court to correct the record.  The trial court responded:  "California Department of Corrections request[s] that all credits are to be reported on the determinate sentence form (CR290 or CR2901), when indeterminate and determinate terms are combined."

**Discussion**

Amos contends the indeterminate abstract of judgment should be corrected to reflect the 545 days of custody credit.  The People disagree.

The People, citing section 2900.5, subdivision (b), argue that credit is given only once for a single period of custody that is attributable to multiple offenses that are sentenced consecutively.  Subdivision (b) states:  "For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related

17

to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

Since section 2900.5 does not distinguish between determinate and indeterminate terms, the People reason that "[t]he distinguishing characteristics required by this section are that the credit limitation applies to consecutive sentences and to a single period of custody attributable to multiple offenses." Since Amos received consecutive sentences, his presentence custody was a single period of custody attributable to multiple offenses and no correction is necessary.

Amos argues he is not requesting double custody credits. Instead, Amos seeks to have the indeterminate abstract of judgment reference the credits listed on the determinate abstract of judgment.

However, there is no requirement that the abstract of judgment for the indeterminate sentence refer to the custody credits awarded on the determinate sentence. Section 669 provides, in part: "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 [defendant must serve a minimum of seven years for each life sentence imposed] or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole."

Indeterminate-term crimes and determinate-term crimes are subject to two different sentencing schemes. Sentencing for the indeterminate crime of murder is governed by section 190, and sentencing for determinate-term crimes is governed by sections 1170 and 1170.1. Sentencing under these two sentencing schemes is performed separately and independently from one another. Only after each is determined are they added together to form the aggregate term of imprisonment. (*People v. Neely* (2009)

18

176 Cal.App.4th 787, 797.)  Since the 545 days credited to the determinate term appears on that abstract of judgment, there is no need to refer to those credits on the determinate abstract of judgment.

## DISPOSITION

The judgments are affirmed.


                                                    RAYE                , P. J.



We concur:



        BLEASE         , J.



        ROBIE          , J.