Filed 3/4/22  P. v. Urena CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTIN ANTHONY URENA,<br><br>    Defendant and Appellant. | D079449<br><br><br>(Super. Ct. No. C1121948) |

APPEAL from a judgment of the Superior Court of Santa Clara County, Shelyna V. Brown, Judge.  Affirmed and remanded with directions.

Geoffrey M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Jeffrey M. Laurence, Assistant Attorneys General, Eric D. Share and John H. Deist, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Martin Anthony Urena of second degree murder (Pen. Code,[1] § 187; count 1) and possession of a firearm by a felon (§ 12022, subd.

---

[1]    Undesignated statutory references are to the Penal Code.

(a)(1); count 2). It found true allegations that he personally discharged a firearm during the commission of the murder (§ 12022.53, subd. (d)). The court separately found that Urena had suffered a prior serious felony conviction that qualified as a violent or serious felony (§ 667, subds. (a), and (b)-(i)). It sentenced him to an aggregate prison term of 62 years eight months to life as follows: for count 1, 15 years to life, doubled under section 667, subdivision (e)(1) to 30 years to life, plus an enhancement of 25 years to life for the firearm enhancement. On count 2, the court imposed a consecutive term of 16 months, doubled to 32 months for the strike prior, plus a five-year enhancement under section 667, subdivision (a)(1).

Urena contends insufficient evidence supported the court's erroneous instruction with CALCRIM No. 3471 on self-defense when a defendant starts a fight or engages in mutual combat with the victim. He further contends that by failing to define the term "starts a fight" as used in that instruction, the court violated its sua sponte duty to properly instruct the jury, likely leading the jury to misapply the law. Urena argues he was prejudiced because the instruction lowered the prosecution's burden of proof. He alternatively argues he received ineffective assistance of counsel, who failed to object to the instruction or request the court define "starts a fight." Finally, Urena contends that under Senate Bill No. 1393, we should remand this matter for the trial court to resentence him according to its recently granted discretion to dismiss the section 667, subdivision (a)(1) enhancement.

The People respond that CALCRIM No. 3471 correctly states the law, and it was supported by the evidence; however, any instructional error was harmless because "there was no evidence that [Urena] had shot [the victim] in self-defense." They argue as to the ineffective assistance of counsel claim that Urena's trial attorney had no basis to object to the jury instruction. The

2

People agree Senate Bill No. 1393 applies, but claim a remand would be futile in light of the trial judge's other rulings in this case. We affirm and remand with directions set forth below.

FACTUAL AND PROCEDURAL BACKGROUND

R.B. testified that in 2011, he was a member of El Hoyo Palmas (EHP) criminal street gang, a subset of a Norteño gang in San Jose, California. On June 11, 2011, shortly after midnight, he attended a house party with C.T., and two other EHP members, Hector Garcia and J.R. Garcia, who wore a baseball cap with the letter "P" on the front, a symbol of the EHP gang, later became visibly drunk and lay on the hood of a car with his eyes closed. Urena and M.S., who also were EHP gang members, apparently believed Garcia's intoxication and behavior reflected poorly on their gang; therefore, they angrily accused him of "being embarrassing and . . . not conducting himself right."

Urena pulled Garcia's cap off his head and threw it to the ground, saying Garcia did not "deserve to wear" it. Garcia stood up, shoved Urena and said something like, "What you doing [*sic*]? What's up with that?"

Urena gave R.B. a revolver to hold and resumed fighting with Garcia; afterwards, Urena and Garcia continued to argue and swear at one another. The entire fistfight lasted approximately one minute, and none of the three men appeared seriously hurt afterwards. Urena retrieved his revolver from R.B.

According to R.B., M.S., and Garcia continued "talking amongst each other for some time." R.B. soon heard Urena tell Garcia, "Let's take a walk." Garcia looked angry, but he complied. Urena and Garcia walked past about five houses and into a driveway behind a vehicle and some trees. About 30 seconds later, R.B. heard three gunshots. He found Garcia lying in the

3

driveway with a gunshot wound in the chest. R.B. saw no weapons nearby. Garcia was still alive, but struggling to breathe. R.B. tried to help Garcia by applying pressure to the gunshot wound.

When police arrived at the scene, Garcia was not responsive. The investigating police officer found no weapons in Garcia's pockets or near his body, and there were no blood drops leading to or near his body.

The coroner who conducted the autopsy testified Garcia's cause of death was multiple gunshot wounds, one of which penetrated his heart, causing massive bleeding. She testified the gunshots likely were fired from a distance of at least two or three feet because there was no apparent gun residue on Garcia's clothing. A criminalist testified that Urena's DNA was found in Garcia's fingernail clippings.

In a telephone call to 911 and in initial interviews with police, R.B. lied about different aspects of the case. However, he claimed he eventually started telling police the truth, and was testifying truthfully at trial. Among the inconsistences in R.B.'s statements, he initially gave a wrong account of who shot Garcia, saying that some unknown people had driven by, got in a fight and shot Garcia. R.B. failed to mention that he had handled Urena's gun. R.B., in a police interview, and at the preliminary hearing, testified that he had seen Urena running away from the driveway while he and C.T. were running toward it. However, at trial, R.B. said that after he heard the gunshots, he did not recall seeing Urena. At the preliminary hearing, R.B. testified he did not hear Urena telling Garcia to take a walk together.

R.B. admitted on cross-examination: "I know I lied to [the police] about trying to—just driving away the—the original suspect [*sic*], but I was just fabricating lies. And I can't even keep track of it because it was a lie." R.B. explained he had lied because he "was in the gang and that's one of the rules

4

to the gang [*sic*] is even if it happened—like no matter what, you're not supposed to say, even if it was your friend or anything like that. You're not supposed to become a witness."

Both J.R. and C.T. testified at trial in the prosecution's case-in-chief, but they were reluctant and hostile witnesses. J.R. denied knowledge of Garcia's shooting. He responded, "I don't remember" to nearly all of the prosecutor's questions. C.T. denied seeing Urena at the party, but said he had seen M.S. and J.R. arguing with Garcia on the street outside the house. C.T. also denied witnessing the shooting, but said he believed M.S. was the shooter. C.T. claimed his preliminary hearing testimony was false, and he did not remember making any statements to police immediately after the shooting. The trial court allowed the prosecutor to introduce evidence of J.R.'s and C.T.'s inconsistent statements to police and at the preliminary hearing.

A San Jose Police Officer testified that in his interviews with J.R. and C.T. shortly after the shooting, each gave an account of the incident consistent with R.B.'s trial testimony.

*The Defense Case*

Kenton Wong, a crime scene reconstruction and ballistics expert, was asked on direct examination: "Can you tell us anything regarding the position of Mr. Garcia in comparison to the shooter?" Wong replied, "Well these angles that are downwards, they are fairly steep in slope. . . . [¶] . . . So those bullet holes being in [Garcia's] upper chest that would either place the shooter's position far above him or somehow he has been down lower, but somehow—I mean . . . the shooter's position has to be above Mr. Garcia, who is six feet six." Wong stated Garcia might have been bent over and in motion when he was shot. On recross-examination, Wong acknowledged Garcia

5

could also have been kneeling, bending over, or moving backward when shot. Wong conceded that without knowing the exact position of either Garcia or the shooter, it was impossible to offer a precise opinion about the posture of either party at the time of the shooting.

J.J. testified that she was on her front porch and heard a group of people fighting in the street. The fight moved down the street, and she heard someone say, "Don't shoot." She next heard one or two gunshots, and ran inside her home.

J.R. and C.T. testified they had lied to the police in initially describing the shooting and Urena's role in it.

*Closing Arguments*

The prosecutor argued to the jury that self-defense was inapplicable here: "I'm going to talk about self-defense several times today, but here are some basic reasons why in this case it's not a proper use of self-defense [*sic*]. [The one seeking to benefit from self-defense c]an't start the fight. In this case, again, the instigator at every portion, at every step of the way was [Urena]. [¶] [He] can only use reasonable force. We are going to talk about this, but [he] can't bring a gun to a fist fight. [Garcia] didn't use a weapon. Didn't have a weapon. And [self-defense] cannot be contrived. In other words, you can't set something up where you have got a gun and you goad someone into fighting you and you are like, I'm going to defend myself and pull a gun and shoot him."

The prosecutor further argued: "So how do we get to voluntary manslaughter? You have a perfect self-defense. Okay. So there's—if it's perfect self-defense, then [Urena's] not guilty of anything. If it's imperfect self-defense, they can lower it down to manslaughter. [¶] So it's an actual but unreasonable belief in the necessity to defend. [¶] So you have to believe

6

that Mr. Urena honestly but unreasonably believed in the inherent danger of death or great bodily injury. [The danger h]as to be apparent. Has to be immediate. Has to be present. And that the victim will cause great bodily injury or death to the defendant. So you have to believe that [Urena] believed that. [¶] But again, the evidence in this case shows that he— absolutely that's not what [Urena] was thinking. He set this all up. It was all in motion because of him. [¶] . . . [I]f he had been in a fight with Mr. Garcia—and neither one of them it appears was knocked down or severely injured in any kind of way—they just had a fist fight and perhaps Mr. Urena was losing it. But then what happens. [¶] So if [Urena] was afraid or worried of [*sic*] Mr. Garcia at that point, he probably would have gotten his gun and gone home or just gone home. But what does he do? He gets his gun and then he goes over to Mr. Garcia and leads him down the street. If he was worried wouldn't he stay where people are? If he was worried he would not walk off into the night with the person all the way down a football field and then hide behind a truck. [¶] There simply was no fear at that point or actual belief that Mr. Garcia would kill or cause great bodily injury to Mr. Urena."

In dismissing a heat of passion defense, the prosecutor argued: "[T]here isn't any provocation here by the victim. [Garcia] is lying on a car. [He] is getting his hat flipped off. He's getting fought and he's getting led down the street. [¶] So it is not voluntary manslaughter. [Urena] is guilty of first degree murder. He did not act in self-defense. The fight was over. There was no threat. [Urena] is the one who brought a gun to a fist fight. He intentionally shot the victim and he intentionally caused the acts or did the acts that caused the death of Mr. Garcia."

7

The prosecutor directly addressed Wong's testimony as interpreted by defense counsel: "That is not self-defense because [Garcia] is lunging at [Urena] with his fists. [Garcia's] at least three feet away, per Mr. Wong's own testimony, at least three feet away when he's shot. [¶] So if someone is lunging at you with just their fists, it is not possible to then take a gun and use that kind of force, that kind of deadly force, to stop someone who you had already fought earlier and no great bodily injury had occurred. [¶] So that even assuming that particular scenario, it is still not self-defense."

Defense counsel never expressly argued to the jury that Urena had shot Garcia in self-defense or upon any type of provocation. Rather, based on Wong's testimony, she suggested Garcia might have been shot while bent over and possibly was "charging" toward the shooter: "[A] logical explanation would be that [Garcia was] charging towards someone, whoever ultimately shot him, in an aggressive manner moving his body as he started forward. As I said, we don't know if there is a continuation of the fight. It's possible that the shooter was in such an emotional state during the fight, because remember, Mr. Garcia was the winner, that that never really calmed down. We have no evidence about that—what the emotional state of anyone was."

## DISCUSSION

### I. *CALCRIM No. 3471*

Urena contends the court erroneously instructed the jury with CALCRIM No. 3471, as "there was no substantial evidence that [he] had either engaged in mutual combat or started the fight with Garcia." He further contends the instruction failed to define "starts a fight," so the jurors might have assumed that "Urena's series of insults to Garcia easily meets the everyday, layperson's understanding of 'starts a fight.'" Urena additionally contends the instruction was inapplicable because no evidence showed he had

8

withdrawn from the fight. Accordingly, he contends the instruction "prevented the jury from fairly evaluating [his] only viable theory of defense: that he acted in self-defense when he shot and killed [ ] Garcia."[2]

A. *Background*

After presentation of the evidence, the trial court informed the attorneys it would instruct the jury with several pattern instructions on self-defense and provocation: CALCRIM No. 500—Homicide: General Principles; CALCRIM No. 505—Justifiable Homicide: Self-Defense or Defense of Another; CALCRIM No. 520—First or Second Degree Murder With Malice Aforethought; CALCRIM No. 521—First Degree Murder; CALCRIM No. 522—Provocation: Effect on Degree of Murder; CALCRIM No. 570—Voluntary Manslaughter: Heat of Passion-Lesser Included Offense; CALCRIM No. 571—Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another-Lesser Included Offense; CALCRIM No. 3470—

---

[2] Urena generally argues: "Here, the trial court erred by instructing the jury with [CALCRIM] No. 3471 because there was no substantial evidence that Urena had either engaged in mutual combat or started the fight with Garcia, as those terms are defined by California law." Urena specifically argues: "Here, the evidence was undisputed that [he] did not initiate physical violence against Garcia. [R.B.] testified that the fight between Urena and Garcia began when Urena and [M.S.] verbally berated Garcia, then Urena 'flicked' Garcia's baseball cap off of his head. . . . Garcia reacted to this insult by standing up and shoving Urena. . . . A fistfight ensued. . . . This conduct by Urena does not meet the definition of 'starts a fight' in [CALCRIM] No. 3471 because Urena's initial provocation of Garcia was non-violent. Instead, it was Garcia who first shoved Urena and began the fistfight. . . . Thus, there was not sufficient evidence before the jury that Urena started the fight with Garcia, as that term is used in [CALCRIM] No. 3471. Because the instruction lacked substantial evidentiary support, the trial court erred by delivering it to the jury."

9

Right to Self-Defense or Defense of Another (Non-Homicide);[3] CALCRIM No. 3471—Right to Self-Defense:  Mutual Combat or Initial Aggressor;[4] CALCRIM No. 3472—Right to Self-Defense:  May Not Be Contrived; and CALCRIM No. 3474—Danger No Longer Exists or Attacker Disabled.

Defense counsel agreed to these instructions.[5]

---

[3]     The court instructed the jury with CALCRIM No. 3470:  "[T]he defendant acted in lawful self-defense if:  1.  The defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully.  [2.]  The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and[, 3.]  The defendant used no more force than was reasonably necessary to defend against that danger."

[4]     The court instructed the jury with CALCRIM No. 3471:  "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:  [¶]  1.  He actually and in good faith tried to stop fighting.  [¶]  2.  He indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting.  [¶]  And 3.  He gave an opponent a chance to stop fighting.  [¶]  If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.  [¶]  However if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had a right to defend himself with deadly force and was not required to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting.  [¶]  A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

[5]     The court in discussions with the parties said it would grant a defense motion to present evidence of Garcia's prior violent acts against third parties, adding that such evidence would be admissible only if Urena relied on self-defense.  Defense counsel did not subsequently seek to introduce the prior acts evidence.

B. *Applicable Law*

We review the correctness of a jury instruction de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Bates* (2019) 35 Cal.App.5th 1, 9.) We review the instructions as a whole, and not just parts of a particular instruction. (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 756; *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [reviewing court's duty is to look at the instructions as a whole, not in isolation].) A trial court has a duty to instruct the jury sua sponte on general principles that are closely and openly connected with the facts of the case. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) In that regard, a trial court has a sua sponte duty to give instructions on self-defense if there is substantial evidence to support that defense and the defense is not inconsistent with the defendant's theory of the case. (*Ibid.*; *People v. Elize* (1999) 71 Cal.App.4th 605, 615.) Substantial evidence for this purpose means evidence that a reasonable jury could find persuasive. (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

Self-defense requires that the defendant actually and reasonably believe in the need to defend, which must be objectively reasonable. The jury must consider all relevant circumstances to determine whether a reasonable person in the defendant's position would have believed in the need to defend. (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 518.) In exercising self-defense, however, a person may only use that force which is necessary in view of the nature of the attack. (*People v. Clark* (1982) 130 Cal.App.3d 371, 377.) If the defendant started the fight using non-deadly force and the opponent suddenly escalates to deadly force, the defendant may defend himself using deadly force. (See *People v. Quach* (2004) 116 Cal.App.4th 294, 301-302.)

11

We cannot set aside a judgment on the basis of instructional error unless, after an examination of the entire record, we conclude the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) "We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "[I]nstruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. . . . [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130.)

C. *Analysis*

The People concede, and we agree, that there was insufficient evidence to support instruction with CALCRIM No. 3471. They argue: "[I]t was the evidence in this case, not any instruction, that prevented the jury from concluding that [Urena] had shot Garcia in self-defense. Again, [R.B.] testified (with substantial corroboration from the pretrial statements of [C.T. and J.R.]) that the entire fistfight between Garcia, [Urena], and [M.S.] had been brief, perhaps a minute long. Thereafter, the men continued to argue with one another, but that argument subsided and [Urena] asked Garcia to 'take a walk.' [Urena] and Garcia then walked slowly down the street before disappearing into a driveway. Moments later, witnesses heard a voice cry out, 'Don't shoot,' followed almost immediately by two or three gunshots.

12

[R.B.] and [C.T.] ran the short distance down the street and saw Garcia dying in the driveway, with two gunshot wounds in his chest and no weapon nearby. [Urena] was no longer present, and both [R.B.] and [C.T.] later told the police that they had seen [Urena] running away from the driveway as they were running toward it. In light of this evidence, the jurors had no basis to find that Garcia had initiated deadly force against [Urena] that would have justified a lethal response."

The People also reason: "CALCRIM No. 3471 ultimately proved unhelpful to the defense because there was no evidence that [Urena] had shot Garcia in self-defense. But it appears the defense attorney accepted the instruction because it allowed theoretical support for her suggestion that Garcia had been shot while 'charging at' the shooter."

Despite conceding there were no percipient witnesses to the murder, Urena contends he was entitled to rely on a theory of self-defense: "With no eyewitnesses to the actual shooting, Wong testified that the physical evidence established a reasonable possibility that Garcia was *bent over and moving forward* when the lethal shots were fired."

We conclude insufficient evidence supported the CALCRIM No. 3471 self-defense instruction. As R.B. testified, after the fistfight ended, Urena retrieved his revolver from R.B. and the fistfight never resumed. Instead, Urena and Garcia exchanged words, and Urena asked Garcia to go for a walk. Garcia accompanied him, and they disappeared beyond some houses and bushes into a driveway, where no one witnessed the shooting. The coroner and Wong testified that because they did not witness the incident, they could not ascertain the parties' positions when Garcia was shot. Lacking that critical information, it is speculative to conclude, as Wong and Urena do, that Garcia might have "charged" at R.B.

13

However, we conclude that even if the court erroneously instructed with CALCRIM No. 3471, it did not prejudice Urena, who benefitted by relying on a defense to which he was not legally entitled. Further, if the jury were inclined to acquit Urena based on self-defense, it could have relied on the court's several other self-defense instructions listed above. Finally, the court instructed the jury with CALCRIM No. 200 that not all instructions were applicable here, and that words and phrases not specifically defined in these instructions are to be applied using their ordinary everyday meanings. We presume the jury followed this instruction. (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.) Therefore, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## II. *Ineffective Assistance Of Counsel Claim*

Urena contends his trial attorney rendered ineffective assistance by failing to object to CALCRIM No. 3471 or request the trial court define the term, "starts a fight."

To prove counsel provided ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and the deficient performance prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

14

perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.) We accord great deference to counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 877, as mod., rehg. den. Apr. 12, 2006.)

"Defendant must also show that if counsel's performance fell below acceptable standards in some respect, a reasonable probability exists that a more favorable outcome would have been reached absent the deficient performance. [Citation.] That probability must be one sufficient to undermine confidence in the outcome of the trial." (*People v. Karis* (1988) 46 Cal.3d 612, 656.) In considering a claim of ineffective assistance of counsel, it is not necessary to determine " 'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland v. Washington, supra,* 466 U.S. at p. 697.)

Because we have concluded Urena failed to show prejudice from any instructional error, his ineffective assistance of counsel claim fails for lack of a showing of prejudice.

### III.  *Senate Bill No. 1393 and Resentencing*

The People concede that Senate Bill 1393 applies as the trial court imposed a five-year enhancement under section 667, subdivision (a)(1). However, they argue there is no basis for remand because the court would not have stricken Urena's prior serious felony conviction, as it declined Urena's motion to dismiss his prior strike under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

When the court sentenced Urena, section 667, subdivision (a)(1) required that a defendant with a prior conviction for a serious felony receive an additional consecutive term of five years. (See *People v. Franks* (2019) 35 Cal.App.5th 883, 892.) Section 1385, subdivision (a), has long allowed sentencing courts to strike or dismiss an action in the interests of justice. Until January 1, 2019, subdivision (b) of section 1385 precluded the dismissal of a prior serious felony conviction.

Senate Bill No. 1393 amended sections 667 and 1385, effective January 1, 2019, deleting the provisions in those statutes that prohibited a trial judge from striking a section 667 prior serious felony conviction enhancement in furtherance of justice. (Stats. 2018, ch. 1013, §§ 1-2.) It applies retroactively to all cases or judgments of conviction in which a five-year term was imposed at sentencing, based on a prior serious felony conviction, provided the judgment of conviction is not final. (*People v. Stamps* (2020) 9 Cal.5th 685, 699; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-972.)

Despite the fact the court denied Urena's *Romero* motion, Urena correctly points out that, in imposing the five-year term under section 667, subdivision (a)(1), the court explicitly stated it lacked the authority to strike that enhancement. Further, in imposing the count 2 sentence, the court stated, "[B]ased on Mr. Urena's youthfulness and his mental health, the Court does find that the mitigated sentence of 32 months is appropriate." On this ambiguous record, we cannot say a remand would be futile. Accordingly, we remand the matter for Urena to receive a decision " 'made in the exercise of the "informed discretion" of the sentencing court.' " (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) We express no opinion regarding how the court should exercise its discretion.

16

DISPOSITION

The judgment is affirmed. The matter is remanded for the court to permit Urena to seek relief under Senate Bill No. 1393.


                                                                    O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


GUERRERO, J.