Filed 5/16/24  P. v. White CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>LATRAIL WHITE,<br><br>        Defendant and Appellant. | A166488<br><br>(Alameda County<br>Super. Ct. No. 22CR001348) |

A jury convicted Latrail White of special circumstances murder and other offenses in connection with a drive-by shooting.  On appeal, White contends his conviction must be reversed due to evidentiary and instructional errors.  We affirm, but remand for the limited purpose of correcting the sentencing minute order and abstract of judgment.

**BACKGROUND**

*Information*

In May 2022, the prosecution filed an information charging White with: (1) murder (Pen. Code, § 187, subd. (a))[1] with the special circumstances that he discharged a firearm from a motor vehicle at another person outside the vehicle with the intent to cause death (§ 190.2, subd. (a)(21)) and discharged a firearm from a vehicle with the intent to inflict great bodily injury (§ 190,

---

[1] All undesignated statutory references are to the Penal Code.

subd. (d)) (count 1); (2) shooting from a motor vehicle (§ 26100, subd. (c)) (count 2); (3) two counts of unlawful possession of a firearm (§ 29820, subd. (b)) (counts 3 & 4); and (4) carrying a loaded firearm on his person in a city (§ 25850, subd. (a)) (count 5).  As enhancements to counts 1 and 2, the information alleged that White personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and discharged a firearm (§ 12022.53, subd. (c)), causing great bodily injury or death (§ 12022.53, subd. (d)), and personally inflicted great bodily injury (§ 12022.7).

*Evidence at Trial*[2]

On the morning of July 24, 2021, R.J.[3] was talking to Travis Ward on the sidewalk of 23rd Avenue between East 17th and Foothill Boulevard in Oakland, when a woman approached them.  Ward began to show her how to ingest methamphetamine.  At that point, R.J. walked away because he did not like the smell of methamphetamine.

A couple minutes later, R.J. heard Ward whistle and saw him walk towards the street.  R.J. heard Ward say, "You a hard man to catch up with," but did not see who Ward was talking to.  He next heard a man say, "Why are you patting your pockets?"  Ward responded, "My phone," or "I'm looking for my phone."  R.J. had known Ward for 15 years and had never seen him with any type of weapon.  R.J. next heard several pops.  He heard Ward moan, and realized Ward was being shot at.  R.J. dove to the ground behind some parked cars to avoid being hit.

---

[2] We provide an overview of the facts here and additional facts in connection with our discussion of defendant's claims.

[3] R.J. appeared in custody after being arrested for failing to comply with a prosecution subpoena to appear; he admitted he was a reluctant witness.

M.A.[4] had known Ward for approximately 10 years. He described the area near 23rd Avenue and Foothill Boulevard as a neighborhood "hang out" area. M.A. was in his parked van on the corner of East 17th Street and 23rd Avenue on the morning of July 24, 2021. He saw Ward speaking to R.J. and a woman immediately before hearing four or five pops that sounded like gunshots. M.A. heard a car engine revving. When he looked up, he saw a blue two- or four-door Mercedes Benz sedan turn from southbound 23rd Avenue onto Foothill Boulevard.

Ward was shot six times and died of multiple gunshot wounds. Police found a cell phone next to Ward's left hand. Police also found six FN model 5.7-by-28-millimeter casings. A criminalist with the Oakland Police Department testified that she had examined tens of thousands of casings over the course of her 15-year career, and had seen FN model 5.7-by-28-millimeter casings approximately 20 times.

Surveillance footage, motor vehicle records, and witness testimony connected White to the Mercedes used in the drive-by shooting. White was observed driving the Mercedes down 23rd Avenue past a vigil for Ward on the day of the murder.

Michael Jaeger, a homicide investigator with the Oakland Police Department, testified that he authored a warrant for White's arrest. Sheriff's deputies arrested White as he was driving the Mercedes on Highway 580 near Berkeley on August 10, 2021. When White got out of the car, he had a Motorola G-Play cell phone in his hand which had a phone number ending in 5402.

---

[4] M.A. was also a reluctant witness who appeared in custody after being arrested for refusing to comply with a prosecution subpoena.

A search of the phone, which included Ward's social media accounts, connected Ward to the scene and to a firearm capable of shooting the caliber of ammunition found at the scene. Using the call detail records and specialized location records for the 5402 number, police were able to establish "with a high degree of confidence" that on the day of the murder, July 24, 2021, the phone was "near the intersection of 23rd Ave, and Foothill Blvd." in Oakland "at 9:21:02 a.m." Additionally, between August 8, 2021, and August 9, 2021, internet searches for "Oakland homicide," "homicide," "murders in Oakland," "1600 block of 23rd Avenue," "Oakland surveillance cameras," "new leads on Oakland homicides," and "new homicide leads in Oakland, California" were conducted on the phone.

White testified that he knew Ward through friends but did not "have a personal relationship with him." He denied having any problems with Ward, and he denied killing him.

White testified that he had picked up the Mercedes from his cousin shortly before being pulled over and arrested on August 10, 2021. White said the Motorola cell phone was in the Mercedes when he picked it up. His statement to the police that he did not know the passcode to the phone was truthful; he claimed that someone had changed the passcode since the last time he used the phone.

*Verdict and Sentencing*

The jury found White guilty on all counts. The jury found true the special circumstances and special allegations alleged in connection with the murder charge in count 1. As to count 2, which charged White with shooting from a motor vehicle, the jury found true the allegations that White personally caused great bodily injury (§ 12022.7, subd. (a)), personally and

4

intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), and personally used a firearm (§ 12022.5, subd. (a)).

On October 13, 2022, the trial court sentenced White to life without the possibility of parole, plus additional terms for the other offenses and the enhancements, some of which were stayed.

## DISCUSSION

## I.

### *The Trial Court Did Not Err in Denying the Motion to Traverse the Search Warrants for the Call Detail Records and Contents of the Motorola Cell Phone*

White contends that the trial court erred in denying his motion to suppress the call detail records and contents of the Motorola cell phone. He argues that "several pieces of important information were deliberately left out of the affidavits to the warrant applications," and this information "would have seriously called into question the magistrate's finding of probable cause." We disagree.

### A.    Additional Background

*Motion to Traverse Search Warrants*

White moved to quash the search warrants on the ground that each warrant was so devoid of probable cause that no reasonable officer would have relied upon it. (*United States v. Leon* (1984) 468 U.S. 897, 923.) He also argued that the court should traverse the warrants and suppress the call detail records and evidence downloaded from the Motorola cell phone based on Investigator Jaeger's intentional or reckless omission of two material facts from the affidavits which supported the warrants. (*Franks v. Delaware* (1978) 438 U.S. 154, 155–156.)

White asserted, first, that Jaeger failed to disclose that on August 5, 2021, he had obtained call detail records for two other cell phone numbers

5

believed to be associated with White—one ending in 3264 and the other ending in 8227—which established that neither cell phone was in Oakland at the time of the homicide. He argued that the evidence concerning the location of the other cell phone numbers was potentially exculpatory and should have been presented to the magistrate. Second, White alleged that Jaeger knew that White's girlfriend had corroborated White's alibi for the date of the homicide, yet he failed to include this clearly exculpatory information in either affidavit submitted to the magistrate. White argued pursuant to *Franks v. Delaware, supra*, 438 U.S. at pages 155–156, that (1) Jaeger's omission of these material facts was the result of a deliberate or reckless regard for the truth; and (2) if the omitted information had been included in the affidavits, the magistrate would not have found either search warrant application supported by probable cause.

The trial court summarily denied White's motion to quash on August 19, 2022; this ruling is not challenged on appeal. The court indicated that it "want[ed] to hear from Officer Jaeger," and therefore proceeded to an evidentiary hearing on the traversal motion on August 22.

Investigator Jaeger testified at the hearing that he searched the TLO database[5] on August 4, 2021 for information about White, who was then a person of interest in the homicide investigation. Jaeger discovered four

---

[5] A "TLO search" relies on "a database that's used by law enforcement which pulls records from areas such as utility bills and other third parties where users provide addresses, or phone numbers, or personal information." A TLO search is unable to determine *when* an individual lived at an address or used a particular phone number, simply that an address or phone number is associated with a person.

phone numbers associated with White.[6]  He ruled out two of the numbers immediately; one was to a landline and the other was associated with a person unrelated to the case.  The third number ending in 8227, was associated with White's mother.  The fourth number, ending in 3264, was a T-Mobile cell phone which did not list any subscriber information.  Jaeger wrote search warrants to obtain the call detail records for the 8227 and 3264 numbers on August 4 because he then believed that White possibly used one or both of those phone numbers.

Jaeger obtained the call detail records for the 8227 and 3264 numbers on August 5.  After reviewing the records for the 3264 number, he decided they were irrelevant to the investigation because this phone number was used infrequently in July 2021, and not at all on July 24, 2021.  The parties stipulated to the admission of the call detail records for the 8227 number. Jaeger was able to determine from these records that the 8227 number was in the area of Dahlia Court in Fairfield around the time of the homicide. White's mother lived at or near Dahlia Court, and Jaeger was aware that White had used his mother's address.  Jaeger cross-referenced the call detail records with other information he had learned during the investigation.  The call detail records put the 8227 number in Fairfield on July 24, 2021, whereas a witness had seen White in Oakland later that day.  Based on this information, Jaeger believed that the 8227 number probably belonged to White's mother.

When White was arrested on August 10, 2021, he had a Motorola G-Play cell phone in his hand, with a number ending in 5402.  Jaeger concluded

---

[6] Jaeger testified that after obtaining possible phone numbers from a TLO search, the next step is to use Zendesk or other databases to try to connect the phone number to the suspect.

that none of the call detail records he received on August 5, 2021 were significant because it was unlikely that White was using any of those numbers at the time of the homicide.

Jaeger spoke by telephone with White's girlfriend on the evening of White's arrest. She confirmed that White had the phone number ending in 5402 on July 24, 2021, and had been using the number "for a long time." White's girlfriend also told Jaeger that White drove the Mecedes in July 2021, and sometimes drove her vehicle, which was a black sedan. White's girlfriend said she was with White on the day of the murder, although "[s]he was pretty vague." She said they spent the night together on July 23, 2021, and drove to Oakland together the next day around noon. Jaeger admitted that he did not include any "discussion at all about her whereabouts with Mr. White on the day of the homicide" in his affidavit.

When asked why he omitted White and his girlfriend's alibi statements from his search warrant affidavits, Jaeger answered: "I think I was just trying to limit it. I wasn't trying to leave exculpatory information out. I think if I were to reread it I would have added [it] in and said I spoke to him. I think the records would help me prove or disprove that fact." Jaeger admitted he did not have an excuse for failing to add the alibi information to his affidavit prior to seeking the second warrant in January 2022: "I don't have a great excuse for it, Your Honor. I was just asking for an extension. I was not thinking about adding the continuation of my investigation with all the extra information . . . I had obtained in that time."

*Trial Court Ruling*

After considering the evidence and arguments presented by counsel, the court found that Investigator Jaeger had not been intentionally deceptive, nor had he acted with reckless disregard for the truth in preparing his

August 11, 2021 affidavit. The court noted it was "curious" that Jaeger included some, but not all, of his conversation with White and White's girlfriend in his affidavit, but the court recognized that Jaeger had included "a lot of other stuff that's exculpatory." The court further determined that even if the entirety of the statements by White and his girlfriend had been included in the affidavit, there was sufficient probable cause to grant the warrant for the call detail records.

As to the January 25, 2022 renewal of the search warrant for the contents of the Motorola cell phone, the court found that it was "certainly sloppy and I would think also reckless to not four months later review your document that you're going to submit to me or one of my colleagues and continue to make sure to be accurate and complete." Even though the court found that the "preparation of [the renewal affidavit] was reckless," it did not "think that the substance of the conversation ultimately would have made any difference in my colleague signing the warrant." The court also ruled that discovery of the call detail records and contents of the cell phone were inevitable after the Motorola cell phone was located on White's person during his arrest.

B.    **Applicable Law**

"A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to

9

traverse.  [Citations.]  A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause.  [Citations.]  In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*People v. Scott* (2011) 52 Cal.4th 452, 484.)

"[A] claim that material facts were omitted from an affidavit differs from a claim that the affidavit contains falsehoods:  'Though similar for many purposes, omissions and misstatements analytically are distinct in important ways.  Every falsehood makes an affidavit inaccurate, but not all omissions do so.  An affidavit need not disclose every imaginable fact however irrelevant.  It need only furnish the magistrate with information, favorable and adverse, sufficient to permit a reasonable, common sense determination whether circumstances which justify a search are probably present.  [Citations.]'  '[A]n affiant's duty of disclosure extends only to "material" or "relevant" adverse facts.'  [Citation.]  '[F]acts are "material" and hence must be disclosed if their omission would make the affidavit *substantially misleading.*  On review under section 1538.5, facts must be deemed material for this purpose, if, because of their inherent probative force, there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination.' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 409–410 (*Sandoval*).)

"In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence.  [Citation.]  We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was

reasonable under the Fourth Amendment." (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 592.) "Because courts accord a preference to searches and seizures conducted pursuant to a search warrant, 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.)

An appellate court " ' " 'ordinarily *looks only at the evidence supporting the successful party and disregards the contrary showing*.' [Citation.]" ' " [¶] . . . . In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment . . . . [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) This is an exceedingly difficult burden to meet. (See *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

**C.    Analysis**

It is the exclusive province of the trial judge to determine the credibility of a witness and the truth or falsity of facts on which that determination depends. (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Here, the court credited Jaeger's explanation that he inadvertently omitted the information regarding White's alibi from his August 11, 2021 affidavit. It noted that Jaeger had included "a lot of other stuff that's exculpatory" in his affidavit. The court also implicitly accepted Jaeger's opinion that the call detail records for the 3264 and 8227 numbers were not relevant to the

11

homicide investigation because it was unlikely White was using either number on July 24, 2021.

White challenges the trial court's factual findings by arguing that Jaeger's omissions were "one-sided," and "too numerous and serious to be attributable to negligence." This argument neither acknowledges the deference we must accord the trial court's factual findings (*People v. Jones*, *supra*, 51 Cal.3d at p. 314), nor explains how the evidence presented at the hearing compels a finding in his favor as a matter of law (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528). Accordingly, we disregard White's conclusory claim of error and accept the trial court's finding—which is supported by substantial evidence in the record—that Jaeger's omissions were inadvertent, or, at most, negligent. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court' "].)

Turning to the January 25, 2022 affidavit requesting to renew the search warrant for the contents of the Motorola cell phone, the trial court found that Jaeger's failure to update his affidavit to ensure it was still accurate and complete was "reckless." Accordingly, we exercise our independent judgment to determine if the omission of the information regarding the 8227 and 3264 numbers and White's alibi was substantially misleading, and if its inclusion would render the affidavit insufficient to support the magistrate's finding of probable cause. (*Sandoval*, *supra*, 62 Cal.4th at p. 410.)

"In determining whether a search warrant is supported by probable cause, we consider 'whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime

12

will be found in a particular place.' " (*People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 592; *Illinois v. Gates* (1993) 462 U.S. 213, 238.) "[S]ufficient probability, not certainty, is the touchstone for reasonableness under the Fourth Amendment." (*Maryland v. Garrison* (1987) 480 U.S. 79, 87.)

Here, the call detail records for the 8227 and 3264 numbers were immaterial to the decision whether Jaeger's affidavit established probable cause to search the contents of the Motorola cell phone. The January 25, 2022 affidavit informed the magistrate that the phone to be searched was located in White's hand when he was arrested on August 10, 2021. Although the phone was locked, Jaeger had observed a text from White's girlfriend on the screen. White's girlfriend confirmed in a telephone interview immediately after White's arrest that White used the 5402 number on July 24, 2021, and had been using it for a long time. The trial court correctly observed that the discovery of the contents of the Motorola cell phone was "inevitable" following White's arrest.

The call detail records for the phone numbers Jaeger obtained through the TLO search do not alter the conclusion that probable cause existed to search the contents of the Motorola cell phone. The 3264 number showed no activity on July 24, 2021, which was inconsistent with White's girlfriend's statement that White texted her on the day of the murder. The 8227 number registered to White's mother was in Fairfield on July 24, 2021, which is where White's mother resided. Providing information about these phones, neither of which was strongly associated with White, would not have altered the magistrate's determination that the affidavit established probable cause to search the phone police found in White's possession.

As Jaeger conceded, he didn't "have a great excuse" for failing to include White's girlfriend's confirmation of White's alibi for the date of the

murder in his January 25, 2022 request to renew the warrants for the contents of the Motorola cell phone. Nevertheless, even when the alibi information is included, the affidavit established probable cause to search the contents of the phone. The affidavit discussed White's substantial ties to the Mercedes which had been described by eyewitnesses to the homicide and depicted in the surveillance video. The license plate on the Mercedes had been read by a license plate reader near Pinole within minutes of the shooting. White had the Motorola cell phone in his hand when he was pulled over on August 10, 2021, while driving the Mercedes. White's efforts to distance himself from the Mercedes and the Motorola cell phone were unconvincing. The magistrate reviewing the January 25, 2022 application was informed that a search warrant for the contents of the Motorola cell phone had previously been authorized, but that the 120-day time period in which to download the data had elapsed. Thus, even if the magistrate had been informed that White's girlfriend had confirmed his alibi for the date of the murder, this fact would not have undermined the magistrate's finding of probable cause given the substantial weight of the other information in the affidavit supporting the requested search. (See, e.g., *Sandoval*, *supra*, 62 Cal.4th at pp. 410–411 [omission of information that police had obtained a warrant to search a different suspect's home on theory that officer was murdered in retaliation for shooting a gang member was immaterial to probable cause to search defendant's home. "During the investigation of a crime, police often will pursue theories that do not turn out to be true"].)

Accordingly, the court did not err in denying the motion to traverse the warrants.

14

## II.

### *The Trial Court Was Not Required to Instruct on Voluntary Manslaughter*

White claims the trial court erroneously failed to instruct the jury on voluntary manslaughter as a lesser included offense to murder because the evidence showed the shooter had an honest but unreasonable belief in the need to act in self-defense. Again, we disagree.

### A.    Additional Background

At a jury instruction conference, defense counsel asked the court to consider instructing the jury on voluntary manslaughter as a lesser included charge to murder. Counsel argued that R.J.'s testimony about the brief conversation he overheard between Ward and the shooter provided "a factual basis for the request." R.J. testified that as Ward walked toward the street, he said to the person in the Mercedes, "You a hard man to catch up with." A man's voice responded, "Why are you patting your pockets?" Ward answered, "My phone," or "I'm looking for my phone." Defense counsel argued that the jury should be instructed on the theory of imperfect self-defense, stating, "I believe that's an argument that can be made independent of whether we decide or we know who did the actually [*sic*] shooting."

The trial court declined to instruct on voluntary manslaughter. It found that R.J.'s testimony did not establish "substantial evidence upon which a jury could reasonably alight in finding that whoever was the shooter here acted with actual but unreasonable self-defense. There just wasn't enough evidence to suggest that."

### B.    Applicable Law and Standard of Review

" ' "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been*

15

*committed.'* [Citation.]" [Citations.]' [Citation.] 'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.) "A trial court must instruct a jury on lesser included offenses when the evidence raises questions regarding whether every element of a charged offense is present. [Citation.] No instruction on lesser included offenses is required if there is no evidence that there was any offense less than that charged. Instructing the jury on a lesser included offense is not required when the evidence supporting such an instruction is weak, but ' " 'whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury,' " ' such an instruction is required. [Citation.] Whether the evidence is substantial is tested by considering whether a jury would conclude the lesser but not the greater offense was committed." (*People v. Vargas* (2020) 9 Cal.5th 793, 827.) "[W]e review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) "Under the doctrine of imperfect self-defense, however, '[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . not murder.' [Citation.] A defendant charged with murder is entitled to an instruction on imperfect self-defense when there is substantial evidence to support the theory." (*People v. Schuller* (2023) 15 Cal.5th 237, 243.) Evidence "is substantial enough to merit consideration by the jury" if "a reasonable jury could find [it] persuasive." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414.)

16

**C.     Analysis**

Under an imperfect self-defense theory, the defendant " 'must actually believe in the need to defend himself against imminent peril to life or great bodily injury.  To require instruction on [this] theory, there must be evidence from which the jury could find that [the defendant] actually had such a belief.' " (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82.)  " '[S]ubstantial evidence of a defendant's state of mind may be found in the testimony of witnesses other than a defendant.' " (*Ibid.*)  It is irrelevant that the defendant may have denied involvement in the crime or that a voluntary manslaughter instruction may be contrary to the defendant's own testimony.  (*People v. Elize* (1999) 71 Cal.App.4th 605, 615.)

Here, other than the ambiguous statement, "Why are you patting your pockets?" White points to no evidence that Ward posed a risk of imminent peril to him.  White presented no evidence that he had ever perceived Ward as a threat.  No evidence established that Ward was generally known to be armed, or that he was armed on July 24, 2021.  To the contrary, R.J. testified he had never known Ward to be armed, and only Ward's cell phone was recovered at the scene of the homicide.  (See, e.g., *People v. Simon* (2016) 1 Cal.5th 98, 134 [voluntary manslaughter instruction properly denied where record devoid of evidence tending to show defendant's subjective fear of victim].)  Because there was no substantial evidence supporting defendant's imperfect self-defense theory, the trial court properly declined to instruct on voluntary manslaughter.  (*People v. Schuller*, *supra*, 15 Cal.5th at p. 243.)  By reason of this holding, we do not reach White's argument that the trial court's failure to instruct on this theory amounts to constitutional error which must be reversed unless harmless beyond a reasonable doubt.  (*Ibid.*)

17

## III.

### *Remand is Required to Amend the Sentencing Minute Order and Abstract of Judgment*

Finally, the record reveals significant discrepancies between the court's oral pronouncement of sentence and the clerk's minute order and abstract of judgment.

At the sentencing hearing, the court sentenced White as to count 1 to life without the possibility of parole for special circumstances murder, with a consecutive term of 25 years to life for the personal discharge of a firearm causing death. (§§ 190.2, subd. (a)(1); 12022.53, subd. (d).) The court also imposed and stayed the following enhancements: 20 years for intentionally and personally discharging a firearm (§ 12022.53, subd. (c)); 10 years for personally using a firearm (*id.*, subd. (b)); and an aggravated term of 10 years for personal use of an assault weapon (§ 12202.5).

As to count 2, the court imposed and stayed a seven-year aggravated term (§ 26100, subd. (c)), enhanced by a 25-year-to-life gun-use enhancement (§ 12022.53, subd. (d).)

As to count 3, the court imposed a three-year upper term (§ 29820, subd. (b)) to be served concurrently with count 1. Similarly, as to count 4, the court imposed a three-year upper term (§ 29820, subd. (b)), but ordered it to be served consecutively to count 1.

As to count 5, the misdemeanor violation (§ 25850, subd. (a)), the court imposed and stayed a one-year term in county jail.

The Attorney General properly points out that as to count 1, the abstract of judgment fails to list the 25-year-to-life section 12022.53, subdivision (d) enhancement. We note that the abstract of judgment also omits the additional enhancements associated with count 1; specifically, the following imposed and stayed enhancements were omitted from the abstract

18

of judgment: 20 years for intentionally and personally discharging a firearm (§ 12022.53, subd. (c)); 10 years for personally using a firearm (*id.*, subd. (b)); and an aggravated term of 10 years for personal use of an assault weapon (§ 12202.5).

The October 13, 2022 sentencing minute order fails to list any of the enhancements associated with counts 1 and 2. The minute order also erroneously reflects count 3 is to run concurrent to count 4 and count 4 is to run consecutive to count 5, the misdemeanor offense. The minute order also fails to note that the one-year county jail term associated with count 5 is stayed.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Accordingly, we remand for the limited purpose of correcting these clerical errors in the sentencing minute order and the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 188.)

## DISPOSITION

The matter is remanded to the trial court with directions to conform the sentencing minute order and abstract of judgment with the oral pronouncement of sentence and to forward a certified copy of the abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____
Mayfield, J.*

We concur:


_____
Stewart, P. J.


_____
Richman, J.


*People v. White* (A166488)


* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20