Filed 4/4/25  P. v. Thomas CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B325416 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. MA079908 |
| LEROY ANTHONY THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge. Affirmed.

Julie Caleca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jason Tran and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In September 2020, Leroy Anthony Thomas cut his wife's throat. A jury found Thomas guilty of attempted murder and other offenses. We affirm.

Thomas argues that the trial court improperly excluded certain evidence. We conclude the trial court did not exceed its discretion under Evidence Code section 352 in excluding that evidence. The evidence Thomas points to was cumulative of other evidence introduced at trial and was more prejudicial than probative.

Thomas also contends that the trial court should have instructed the jury on a heat-of-passion theory that would have allowed the jury to convict him of attempted voluntary manslaughter as a lesser included offense. We agree that a heat-of-passion instruction should have been given. But we find the failure to provide that instruction harmless beyond a reasonable doubt. The jury made findings that precluded any possibility that it could have found Thomas acted in the heat of passion.

Finally, Thomas argues that the trial court erred by failing to instruct on an imperfect self-defense theory. We conclude that there was no error in failing to instruct on that theory.

## BACKGROUND

Thomas and Rovelyn[1] started dating in 2013 and have been married since 2014. They have two children.

Rovelyn testified that Thomas has abused her physically and emotionally since 2014. Thomas was convicted of a

---

1    Because she and Thomas share the same surname, we will refer to Rovelyn Thomas by her first name to avoid confusion. We intend no disrespect.

misdemeanor and a protective order was issued in Rovelyn's favor because, in March 2018, he strangled her and stated he was going to kill her.

Rovelyn successfully sought to modify the protective order to allow peaceful contact with Thomas after they were granted 50-50 custody of their children. Rovelyn did not terminate the order.

In August 2019, Rovelyn and Thomas purchased a home in Palmdale together. A few months later, Thomas started stalking Rovelyn and abusing her verbally. She repeatedly reminded him that those behaviors were prohibited by the protective order. At one point, Thomas responded: "'Well, b[*]tch, let me remind you, I already know what . . . jail look[s] like. And if I go there again and I g[e]t out and you are still alive, I am going to kill you . . . [,] cut you into pieces, [and] burn you in the desert."

A week before September 23, 2020, Tajanae Johnson, a tenant who lived in a converted unit on the Palmdale property, saw Thomas sitting on the patio with his children. He was talking on the phone while "shaking his leg really hard." Johnson asked Thomas whether he was okay. He answered: "'I'm thinking about killing my wife.'" Johnson told Thomas that he did not really mean what he was saying, and that he should take the kids for a walk.

Rovelyn testified that Thomas threatened her a few days later. She stated that, on the evening of September 19, 2020, Thomas was holding an axe when he "remind[ed] [her that] if [she] ever d[id] anything and le[ft] him, he's going to kill [her], cut [her] into pieces[,] and burn [her] in the desert." Fearing for her life, she took the children and fled to a hotel the next morning. Later that day, Thomas threatened her over the phone.

According to Rovelyn, he told her that he knew her car was at the hotel, that he would find her, and that once he did so, he was going to kill her.

On September 22, 2020, Rovelyn dropped the children off at the home so they could spend the night with Thomas, per his request. She agreed to pick them up the next morning so he could go to work.

The parties offered conflicting accounts of the events that transpired on September 23, 2020. Rovelyn testified that she arrived to the family home just past 7:00 a.m. and parked in the driveway. At the time, she observed Thomas repeatedly walking back and forth between the inside of the home and his van parked on the street.

While seated in the car, Rovelyn spoke to Thomas with the driver's side window down. She testified that the first time he passed by the car, she asked where the kids were. He answered that they were inside. As he passed by her car the second time, she again asked where the kids were. Thomas responded that the children were changing and asked Rovelyn to come inside to get them. Rovelyn refused to enter the house and asked Thomas to bring them out. The third time he passed the car, he told Rovelyn that she still had a lot of belongings inside the house and asked her to get out of the car to retrieve them. Rovelyn told Thomas to "throw [her things] outside" and implored him to bring the children outside. Rovelyn testified that she did not want to enter the house because she was scared.

Subsequently, Rovelyn saw Thomas walking toward her quickly with her purse. She testified that he pushed the bag into her face, at which time the driver's side door somehow opened. According to Rovelyn, Thomas then knelt down beside the car

4

and said: "I can't do this, babe, just please come back to me." Rovelyn responded that she "will never[,] ever, ever come back."

At that point, Rovelyn testified, Johnson came out from her unit and stated: "Hey, what's going on here?" Thomas responded that the matter was none of her business and told her to go back inside. Johnson returned to her unit.

Thomas again asked Rovelyn to "come back." After a brief discussion, he asked: "So you will never ever come back to me?" She answered: "Yes, I will never go back to you." At that point, Thomas started repeatedly saying, "Really?" He then began pulling her by her hand and said: "If you will never come back to me, I might as well just kill you, b[*]tch."

Rovelyn testified that, in response, she honked the horn of her car and, somehow, her seatbelt became undone. Thomas then pulled her out of the car and onto the ground, where she landed on her shoulder. He cut her on the neck with a box-cutter. Rovelyn shouted for help and tried to fight Thomas off. Soon thereafter, she found herself lying chest-down on the ground, with his knee pinned onto her back. Thomas grabbed Rovelyn by chin, lifted it up, and slit her throat with the box-cutter. He told her that she "should [have] believe[d] him when he told her that he's going to kill [her]." When Rovelyn begged him for mercy, Thomas said: "It's too late, b[*]tch. I am going to kill you[.]"

Soon thereafter, Rovelyn testified, she felt Thomas dragging her into the house by her hand. She was bleeding a lot and was unable to talk, shout, move, or see.

Rovelyn testified that when she was inside the house, she heard her son's voice and asked for help. She then realized that she was in the bathroom, where she heard Thomas state: "You are still alive, b[*]tch?" At that point, Thomas grabbed her by the

hair and cut her on the neck again with a blade that felt like a knife.  Subsequently, Thomas left the bathroom and closed the door.  Rovelyn locked the door and wrapped her shirt around her neck.  Sometime thereafter, she testified, a law enforcement officer found her in the bathroom.

Thomas testified to a different version of the events.  He related that, prior to Rovelyn's arrival, he was walking back and forth between the house and his truck to load equipment required for that day's work.  Subsequently, he approached her while she was in her car and told her that he was "going to give her all her stuff."

Thomas testified that he brought out a bag containing Rovelyn's passport and other "important paper[,]" telling her she should have them.  Rovelyn opened the driver's side door, and he placed the bag inside.  Thomas then knelt down by the car and told her that, the night before, he had viewed "some tapes" showing her "prostituting out of [his] house" with Johnson.  He told Rovelyn that he was "very disappointed in the tapes . . . [he] had seen, [and] that [he] did not want her to take the kids that day because [the tapes] involved . . . [his] six-year-old daughter."  In addition, Thomas informed Rovelyn that he "did not want [his] kids to be around her at the moment" and that he "was going to take her to the police."

According to Thomas, Rovelyn "got very upset when [he] told her about the tape."  While sitting in the driver's seat, Rovelyn used her left leg to "kick[ ] [Thomas] in the balls," causing him to fall backward onto his back.  He got up quickly and saw Rovelyn sitting sideways on the driver's seat, with a box-cutter in her right hand.  Thomas testified that she then used the box-cutter to cut him on the left cheek, behind his ear.

At that point, Thomas testified, he grabbed Rovelyn's hand and wrested the box-cutter from her grip, causing her to fall on top of him. After that, he did not "remember a lot of what happened." Instead, he stated, "It's like . . . [his] hands moved but [his] mind . . . [was] not catching up." He testified that he "was very upset at that point[,]" but he could not "remember what was going through [his] mind" at the time. Thomas explained: "I was like doing something but I'm not doing it. It was moving fast but I'm moving slow. I can't recall. I can't tell you the feeling."

Thomas testified that the next thing he remembered was standing beside Rovelyn while she was laying on the ground, bleeding from her neck. He was still holding the box-cutter. Observing their neighbor taking pictures of them, he took Rovelyn into the house in order (Thomas testified) to get her out of the neighbor's view. Inside the house, Thomas put a towel around her neck. Thomas denied cutting her throat in the bathroom. He then left the house "and . . . just ke[pt] walking."

Detective Miguel Ruiz and his partner arrested Thomas later that morning. They found him walking on the sidewalk three to four blocks away from his house. Thomas was disoriented.

Thomas was charged with attempted willful, deliberate, and premeditated murder (Pen. Code[2], §§ 664/187, subd. (a); count one); violation of a domestic relations court order, i.e., a criminal protective order obtained under section 136.2, resulting in injury (§ 273.6, subd. (b); count two); and criminal threats (§ 422, subd. (a); count three). The information further alleged

---

2      Unless otherwise specified, all undesignated statutory references are to the Penal Code.

that, on count one, he personally used deadly and dangerous weapons, i.e., a box-cutter and a knife (§ 12022, subd. (b)(1)), and inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)).

A jury found Thomas guilty as charged. In so doing, the jury expressly found true the allegation that "the [attempted] murder was committed willfully, deliberately[,] and with premeditation within the meaning of" section 667, subdivision (a). Subsequently, the trial court sentenced Thomas to life in prison with the possibility of parole, plus an additional nine years.

## DISCUSSION

### I. Evidentiary Error

#### A. Standard of Review

"We review the trial court's rulings on the admission of evidence for abuse of discretion." (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) In so doing, "we review the [trial court's] ruling, not [its] reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582.)

#### B. Analysis

The trial court relied on Evidence Code sections 787 and 352[3] to prohibit Thomas from presenting testimony by certain witnesses concerning allegations that Rovelyn had extramarital affairs, that she may have engaged in prostitution for a living, that she had deceived certain other lovers out of money, and that she may have been trying to poison Thomas. Thomas contends

---

3     For purposes of this section of the Discussion, undesignated statutory references are to the Evidence Code.

that this ruling was prejudicial error because the excluded evidence assertedly: (1) undermined Rovelyn's credibility; and (2) shed light on his state of mind at the time of the attack, showing that, rather than acting with premeditation and deliberation, he attacked Rovelyn out of heat of passion and/or in self-defense.

The Attorney General concedes that the trial court erred by finding the disputed evidence inadmissible under section 787. Section 787[4] has not applied to criminal cases since article I, section 28(d) was added to the California Constitution by initiative in 1982. (*People v. Harris* (1989) 47 Cal.3d 1047, 1081.) We agree that the trial court should not have relied on section 787 to exclude the evidence.

Nonetheless, we conclude the trial court properly excluded the evidence under section 352. We further conclude that, even if the evidentiary ruling was improper, any error was harmless.

"Under section 352, a trial court may in its discretion exclude material evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. The weighing process under section 352 depends on the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably

---

4      Section 787 provides: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Applying these well-settled principles, we first note that the disputed evidence was almost entirely cumulative. "Evidence Code section 352 permits the exclusion of evidence on the ground that it is cumulative." (*People v. Brown* (2003) 31 Cal.4th 518, 576.) "The plain meaning of cumulative as 'repetitive' or 'additional' [citations] obviously implies in this context that other evidence on the point at issue has already been introduced." (*People v. Filson* (1994) 22 Cal.App.4th 1841, 1850.) Here, other evidence presented at trial touched upon each point that Thomas sought to address by way of the disputed evidence. Thomas himself testified as to Rovelyn's infidelity and her apparent line of work when he testified that he had tapes showing her "prostituting out of [his] house." He also testified about her prior attempts to poison him, recounting that she has "tried to put something into [his] food" several times, causing him to "get[ ] sick[.]" Moreover, regarding Rovelyn's credibility generally, Thomas's ex-wife and an individual to whom Rovelyn owed money testified that Rovelyn was untruthful and dishonest.

As to the argument that the excluded evidence was necessary to show his state of mind, Thomas was (of course) the best witness to his own state of mind. He chose to testify and was able to fully inform the jury of his own mental state at the time of the incident. He directly described how he felt and what he was thinking in the events leading up to and during the attack. He testified that he was "very disappointed" after seeing the tapes, that he was "very upset" after Rovelyn cut him with the box cutter, and that he was not fully aware of his actions or what happened after taking the box-cutter from her.

Besides being cumulative, the disputed evidence had little probative value. Thomas's main argument for admitting the evidence was that it related to Rovelyn's credibility. But the disputed evidence was tangentially related to that issue. Although it might have confirmed the testimony of others that Rovelyn had a generally dishonest character, the evidence did not necessarily or clearly demonstrate that Rovelyn had an incentive to testify falsely about the events leading up to the incident, the details of the attack itself and the events that followed, or Thomas's history of domestic violence. Nor was the evidence probative of Thomas's state of mind at the time of the attempted killing. Thomas was the only witness who could describe his own state of mind and he did so at length and in detail.

The disputed evidence was also likely to be inflammatory and unduly prejudicial. "'"Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438.) Instead, "evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not logically to evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

Here, the evidence at issue would have shown Rovelyn's participation in activities carrying significant stigma, including infidelity, prostitution, and poisoning. This evidence carried substantial risk of inflaming the jury's emotions. The jury might

11

have used it improperly to decide Thomas's liability based on its perception of Rovelyn's morality and values.  Thus, given the evidence's limited probative value, its cumulative nature, and the substantial risk of undue prejudice, we conclude the trial court properly excluded the evidence under section 352.

Regardless, we find no prejudice flowing from the asserted evidentiary error.  In so doing, we reject Thomas's contention that the trial court's exclusion of the disputed evidence rises to the level of federal constitutional error, requiring us to discern prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  It is well-settled that "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of [such] error under the 'reasonable probability' standard of" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

Applying the *Watson* standard, there was no reasonable probability that the disputed evidence could have affected the verdict.  No party or witness disputed that Thomas slit Rovelyn's throat with a box-cutter while in the front yard of their home. Rovelyn offered a detailed account of the attack, which was corroborated by Johnson's testimony.  Specifically, Johnson testified:  (1) on the morning of the incident, she received a text message from Rovelyn asking her to help get the children, as Thomas was "trying to make [Rovelyn] come inside the house"; (2) three minutes after speaking to Thomas and Rovelyn outside, she heard the sound of a car horn honking and a woman screaming, followed by silence; and (3) soon thereafter, she saw Thomas dragging Rovelyn's limp body into the home.

12

Additional witness testimony and photographic evidence demonstrated that—as Rovelyn testified and as Thomas denied—Thomas used a knife to cut her throat while they were in the bathroom. When conducting a protective sweep of the home, Deputy Keiosha Reddix of the Los Angeles Sheriff's Department found a serrated kitchen knife with a bloody blade on a nightstand by the bathroom. Besides the trail of blood leading from the front yard into the home, where it continued to the bathroom, there were bloodstains in various places throughout the house.

Finally, the record contains significant evidence indicating that Thomas acted with premeditation and deliberation. As noted above, Johnson testified that, a week before the attack, Thomas told her that he was "'thinking about killing [his] wife.'" She also testified that, on the date of the incident, she received a message from Rovelyn indicating Thomas was trying to lure her into the house, and that shortly before she saw him dragging Rovelyn into the house, she saw Thomas walk toward Rovelyn's car while holding a gas can. Deputy Reddix later found the gas can in Rovelyn's car. Further, during his initial sweep of the home, Deputy Reddix observed "a lot of knives" laid out on the kitchen counter. Subsequently, following her discharge from the hospital, Rovelyn discovered that the home's security cameras were disconnected on the date of the incident—suggesting that, since Thomas had access to the cameras, he might have deliberately turned them off prior to the attack.

In sum, the record contains overwhelming evidence that Thomas attempted to kill Rovelyn by slitting her throat pursuant to a pre-conceived plan. It also contains overwhelming evidence that he took steps to prepare for the killing. The disputed

evidence had, at best, marginal probative value for Thomas's defenses.  Under these circumstances, we conclude that there is no reasonable probability that the asserted evidentiary error, even if it were error, would have in any way affected the outcome of the trial.[5]  (*People v. Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

## II.  Instructional Error

### A.  Introduction

Thomas contends that the trial court erred by failing to instruct the jury on two theories of attempted voluntary manslaughter.  First, he contends that there was sufficient evidence to support an instruction on "heat of passion" attempted voluntary manslaughter.  He argues that there was substantial evidence that Rovelyn provoked him sufficiently to cause him to act rashly or without deliberation and reflection.  Second, he argues that he was entitled to an instruction on imperfect self-defense.  He claims there was substantial evidence that he attempted to kill Rovelyn in what he believed to be his own self-defense, even if that belief was unreasonable.

---

5      For this reason, we reject Thomas's contention that his trial counsel rendered ineffective assistance by failing to adequately dispute the evidence's admissibility.  (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1057-1058 ["To establish constitutionally inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant"].)

Thomas also asserts that the trial court's failure to instruct the jury on these two voluntary manslaughter theories was reversible error under *People v. Schuller* (2023) 15 Cal.5th 237 (*Schuller*). *Schuller* held that a failure to instruct on voluntary manslaughter as a lesser included offense is only harmless error if it is harmless beyond a reasonable doubt under the standard set forth in *Chapman*, *supra*, 386 U.S. at p. 24. (*Schuller*, at pp. 243-244.) *Chapman*, in turn, requires reversal unless it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24.) *Schuller* also held that when there is substantial evidence supporting a voluntary manslaughter instruction, the failure to provide such an instruction cannot be harmless under *Chapman* simply based on countervailing evidence that a killing was deliberate. (*Schuller*, at pp. 260-261, 263.)

We agree with Thomas that there was substantial evidence supporting a heat-of-passion instruction. However, we conclude that the trial court's failure to give that instruction was harmless beyond a reasonable doubt under *Chapman* and *Schuller*. Here, the jury made findings that conclusively precluded it from convicting Thomas of attempted voluntary manslaughter on a heat-of-passion theory. We further conclude that the record lacks substantial evidence supporting an instruction on imperfect self-defense.

### B.    General Principles and Standard of Review

Our Supreme Court has "explained the relationship between murder and manslaughter, as applied to intentional and unlawful killings" as follows: ""Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but

15

who lacks malice is guilty of . . . voluntary manslaughter. [Citation.]" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice . . . when [he] acts in 'a sudden quarrel or heat of passion' [citation], or . . . kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.]'" (*People. v. Rios* (2000) 23 Cal.4th 450, 460 (*Rios*).)

Since proving malice requires proving that the defendant did not act in the heat of passion or in unreasonable self-defense, "[i]f the issue of provocation or imperfect self-defense is . . . 'properly presented' in a murder case [citation], the People must prove beyond reasonable doubt that these circumstances were lacking in order to establish the murder element of malice." (*Rios, supra*, 23 Cal.4th at p. 462, italics omitted.) Moreover, "[b]ecause one who kills unlawfully and intentionally, but lacks malice, is guilty of voluntary manslaughter, '[intentional] voluntary manslaughter . . . is considered a lesser necessarily included offense of intentional murder.'" (*Id.* at p. 461.)

"A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense. [Citation.] '"Substantial evidence" in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed. [Citations.]'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.] Moreover, . . . the sua sponte duty to instruct on lesser included offenses . . . arises even against the defendant's

16

wishes, and regardless of the trial theories or tactics the defendant has actually pursued.  Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistences presented by the defense itself." (*People v. Breverman* (1998) 19 Cal.4th 142, 162-163 (*Breverman*), fn. omitted.)

"We review de novo a trial court's failure to instruct on a lesser included offense [citation], and in doing so we view the evidence in the light most favorable to the defendant."  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### C.    Analysis

#### 1.    Heat of Passion

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' [citation], and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."' [Citations.]  '"[N]o specific type of provocation [is] required . . . ."' [Citations.]  Moreover, the passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"" [citations] other than revenge [citation]." (*Breverman, supra,* 19 Cal.4th at p. 163.)

According to Thomas, the jury could have relied on his testimony to conclude that Rovelyn provoked him by suddenly kicking him in the groin and cutting him on the face with a box-cutter.  In his view, the jury could find that these actions prompted him to retaliate and attack her in the heat of passion.

17

While (as discussed above) there is overwhelming evidence that Thomas's attack was premeditated, we do agree with Thomas that, when viewed in his favor, the record contains substantial evidence from which a reasonable jury could have found that he attempted to kill Rovelyn in the heat of passion. As discussed above, Thomas testified that, on the morning of the incident, he was already upset with Rovelyn and concerned for his children's safety because, the night before, he viewed some "tapes" showing Rovelyn and Johnson "prostituting out of [his] house" with his daughter's involvement. When he confronted Rovelyn about the tapes while knelt on the ground, she "kicked [him] in the balls" with such force that he fell onto his back. He "got up . . . fast and right away" felt her "slice[ ]" him on the cheek with a box-cutter. In our view, a rational jury could find that Rovelyn's spontaneous attack in the midst of the couple's tense, concerning conversation constituted an act of provocation, which would have caused a reasonable person to experience """"[v]iolent, intense, high-wrought . . . emotion"""" and """"act . . . from this passion rather than from judgment."""" (*Breverman*, *supra*, 19 Cal.4th at p. 163.)

A rational jury could also find that Thomas's "reason was actually obscured as the result of the strong passion aroused . . . ." (*Breverman*, *supra*, 19 Cal.4th at p. 163.) He testified that, upon pulling the box-cutter from Rovelyn's hand, he "was very upset" but could not "remember what was going through [his] mind." Nor was he fully cognizant of his actions in the moments that followed. He recalled that, after dragging Rovelyn into the house, he walked around inside and then walked for what felt like "miles." He was disoriented when apprehended by the police later that morning.

Thus, on the record before us, we conclude the trial court erred by refusing to instruct the jury on attempted voluntary manslaughter based on heat of passion. But the analysis does not end here. As already mentioned, we must also consider whether the instructional error was harmless beyond a reasonable doubt under *Chapman, supra*, 386 U.S. at p. 24. (*Schuller, supra*, 15 Cal.5th at 260.)

We find *People v. Franklin* (2018) 21 Cal.App.5th 881 (*Franklin*) instructive. In that case, the defendant argued that the trial court erred by giving a supplemental instruction on attempted voluntary manslaughter based on heat of passion that (the defendant argued) erroneously shifted the burden of proving sufficient provocation from the prosecution to the defendant. (*Id.* at pp. 886, 889.)

The appellate court agreed that the supplemental instruction erroneously shifted the burden of proof on attempted voluntary manslaughter to the defendant. (*Franklin, supra*, 21 Cal.App.5th at pp. 889-890.) Nonetheless, it concluded that reversal was not required because, in light of the jury's other findings based on other instructions, the defendant "fail[ed] to establish prejudice flowing" from the instructional error beyond a reasonable doubt under the standard articulated in *Chapman, supra*, 386 U.S. at p. 24. (*Franklin*, at pp. 884, 891-892, 894-895.)

In support of its holding, the *Franklin* court noted that the jury was given CALCRIM No. 601. Pursuant to that instruction, the jury "was instructed that it could not find premeditation and deliberation unless the People proved beyond a reasonable doubt that [the defendant] 'carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill[,]'" and that "'[a] decision to kill made rashly, impulsively, or

19

without careful consideration of the choice and its consequences is not deliberate and premeditated.'" (*Franklin, supra*, 21 Cal.App.5th at p. 894.) The court also observed that "[t]he erroneous heat of passion instruction . . . did not affect these other instructions." (*Ibid.*) Under those circumstances, the court concluded, the jury's finding that the defendant's act was premediated, deliberate, and willful was "'manifestly inconsistent with [a finding that the defendant] . . . acted under the heat of passion' and nullifie[d] any potential for prejudice" under *Chapman, supra*, 386 U.S. at p. 24. (*Franklin*, at pp. 891, 894.)

The same is true here. Here, as in *Franklin*, the trial court erred when it declined to instruct the jury on attempted voluntary manslaughter based on heat of passion. But here, like in *Franklin*, the jury was instructed on premeditation and deliberation pursuant to CALCRIM No. 601. The jury was informed that, to find true the allegation that "the attempted murder was done willfully, and with deliberation and premeditation," it had to find that Thomas: (1) "intended to kill when he acted"; (2) "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill"; and (3) "decided to kill before completing the act of attempted murder."

Moreover, the instruction further stated: "A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated." Finally, the instruction provided that "[t]he People have the burden of proving this allegation beyond a reasonable doubt."

In reviewing these instructions with the jury during closing argument, the prosecution echoed that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice

and its consequences is not deliberate and premeditated." It then added: "So that is like kind of what they say acting out of heat of passion . . . you walk in, and your spouse is cheating on you. You catch your spouse in the act. You are enraged. You are acting very impulsively, right?"

Thus, the jury was told of Thomas's theory that he acted out of heat of passion. It was presented with evidence and argument enabling it to accept that theory. And it was instructed that it was required to acquit Thomas if it found that the People failed to prove, beyond a reasonable doubt, that Thomas did *not* act rashly, impulsively, or without a careful consideration of his choices. Despite all this, like the jury in *Franklin*, the jury here expressly found Thomas committed the attempted murder "willfully, deliberately[,] and with premeditation within the meaning of" section 667, subdivision (a).

These findings are simply irreconcilable with a finding that Thomas acted in the heat of passion. Therefore, we can conclude beyond a reasonable doubt that an attempted voluntary manslaughter instruction on a heat of passion theory would have had no effect on the verdict. As in *Franklin*, the jury's findings here "'nullifie[d] any potential for prejudice . . . .'" (*Franklin*, *supra*, 21 Cal.App.5th at p. 894.) "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Our conclusion that any error here was harmless beyond a reasonable doubt under *Chapman* is fully consistent with *Schuller*. In *Schuller*, our Supreme Court faulted an appellate court's *Chapman* harmless error analysis. (*Schuller*, *supra*, 15

Cal.5th at pp. 261-263.) The appellate court had found that there was substantial evidence supporting a voluntary manslaughter instruction (in that case, imperfect self-defense). (*Id.* at p. 261.) But the appellate court also found the error harmless beyond a reasonable doubt because there was offsetting "'overwhelming evidence'" that the defendant "'was not acting in any form of self-defense.'" (*Ibid.*) *Schuller* noted a logical contradiction between the appellate court's finding that substantial evidence supported a voluntary manslaughter instruction (which implied that a reasonable jury could have convicted on a voluntary manslaughter theory) and its finding that the failure to instruct was harmless beyond a reasonable doubt because of other evidence in the case (which implied that no reasonable jury could have convicted on a voluntary manslaughter theory). (*Schuller*, at p. 263.) As the Supreme Court explained, "if the court believed an instruction was warranted because there was sufficient evidence from which a reasonable jury could find in [the defendant's] favor on the question of imperfect self-defense, the court could not then, consistent with *Chapman*, go on to find that the error was nonetheless harmless simply because the evidence against imperfect self-defense was so overwhelming that no reasonable jury could have possibly found in [the defendant's] favor on that issue." (*Schuller*, at p. 263, fn. omitted)

In this case, by contrast, we do not find the trial court's instructional error harmless under *Chapman* because "'the evidence'" that Thomas acted deliberately was "'overwhelming'" (although, as noted above, there was in fact overwhelming evidence that Thomas acted deliberately). (Cf. *Schuller*, *supra*, 15 Cal.5th at p. 261.) Rather, we find the error harmless because the jury, having been told that they could not convict Thomas if

22

he attempted to kill in the heat of passion, made findings that precluded any possible determination on its part that Thomas acted in the heat of passion. (See *People v. Lewis*, *supra*, 25 Cal.4th at p. 646.) That resolves precisely the problem with instructional error that animated the Supreme Court in *Schuller*. (See *Schuller*, at p. 255 [explaining that the failure to instruct on voluntary manslaughter was constitutional error because, "the lack of instruction forced [the defendant] to concede, and enabled the prosecution to affirmatively argue" that the voluntary manslaughter instruction in that case "was entirely *immaterial* to the jury's determination of malice" (italics in original)].)

### 2.     Imperfect Self-Defense

"Self-defense requires an actual and reasonable belief in the need to defend against an imminent danger of death or great bodily injury. [Citation.] If, however, the killer actually, but *unreasonably*, believed in the need to defend himself or herself from imminent death or great bodily injury, the theory of 'imperfect self defense' applies to negate malice. [Citation.] The crime committed is thus manslaughter, not murder." (*People. v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261.)

Thomas contends substantial evidence at trial supported an instruction on attempted voluntary manslaughter based on imperfect self-defense. The trial court refused Thomas's request for such an instruction. It reasoned that there was no evidence that Thomas acted in self-defense at all, whether reasonably or unreasonably. It noted Thomas testified that he was holding the box-cutter before he began the attack and could not remember what happened in the moments after he seized the box-cutter from Rovelyn. Thus, concluded the trial court, there was no evidence suggesting that Thomas felt himself to be in imminent

23

danger of death or great bodily injury when he slit Rovelyn's throat and no basis for an imperfect self-defense instruction. On this issue, we agree with the trial court.

Relying primarily on *People v. Elize* (1999) 71 Cal.App.4th 605 (*Elize*) and *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*), Thomas argues that, even though he could not remember what happened in the moments after he grabbed the box-cutter from Rovelyn, the jury could have found that he held the subjective beliefs required for the application of imperfect self-defense based on other evidence in the record. We disagree. The cases on which Thomas relies do not support his argument.

In *Elize*, the defendant sought to reverse convictions for assault and battery based on the trial court's failure to instruct the jury on self-defense. (*Elize*, *supra*, 71 Cal.App.4th at p. 607.) At trial, the defendant testified that, when he shot a firearm, he was in an altercation with two women who were hitting him with iron pipes. (*Id.* at p. 609.) One of them struck a blow breaking his left wrist or arm and, soon thereafter, tried to grab his gun from the holster, while the other continued to hit him on the back. (*Ibid.*) At that moment, he tried to point the gun upward when it fired, causing the attackers to flee. (*Ibid.*)

The appellate court reversed the judgment, concluding the record contained sufficient evidence from which a rational jury could find the defendant acted in imperfect self-defense. (*Elize*, *supra*, 71 Cal.App.4th at pp. 607, 615-617.) In so doing, the court explained: "A jury could disbelieve [the] defendant's testimony that the gun fired accidentally during th[e] struggle. A jury could find that [the] defendant fired the gun intentionally, hoping to end the attack upon him either by hitting one of his assailants or by firing into the air to scare off his attackers." (*Id.* at p. 616.)

24

In *Vasquez*, a witness testified that, during a confrontation, the defendant accused the victim of rape, causing the victim to lunge at him and begin choking him. (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1178.) In response, the defendant pulled out a gun and repeatedly shot the victim, killing him. (*Ibid.*)

The trial court refused to instruct the jury on imperfect self-defense, finding the defendant could not have believed that he was at risk of imminent harm when he shot the victim, as he was armed with a gun, but the victim was not. (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1178.) The appellate court held that this was prejudicial error and reversed the defendant's conviction for second degree murder. (*Id.* at pp. 1179-1181.) The court observed that "[t]he prosecution's chief witness . . . testified [the victim] was choking [defendant] when [defendant] drew his gun and shot [him][,]" and reasoned that "[i]t was for the jury sitting as the trier of fact to decide whether [defendant] actually feared serious injury or death from being choked." (*Id.* at p. 1179.)

In both *Elize* and *Vasquez*, the defendants were actively embroiled in an altercation that objectively suggested the defendants were in imminent danger of serious harm. (*Elize*, *supra*, 71 Cal.App.4th at p. 609; *Vasquez*, *supra*, 136 Cal.App.4th at p. 1178.) Therefore, while neither defendant testified to harboring a fear of imminent death or injury, a rational jury could still infer they held that belief for purposes of self-defense based on evidence of surrounding circumstances suggesting a need to defend against imminent peril.

That is not the case here. The record contains no evidence of surrounding circumstances from which a rational jury could find that Thomas actually believed he was at risk of imminent peril when he slit Rovelyn's throat in the front yard. Thomas

25

testified he had no memory of the events transpiring after he wrestled the box-cutter from Rovelyn. Neither his testimony nor any other evidence demonstrated that Rovelyn tried to attack him again, threatened him, or otherwise engaged in further aggressive behavior, once Thomas had the box-cutter in his grip. Nothing at all—whether from Thomas or any other source—indicated that Thomas was in peril when he began his attack. Thus, even when viewing all evidence in his favor, the record does not indicate that Thomas faced any threat, and therefore acted on fear of life or limb, when he attacked Rovelyn.

On the record before us, the jury could only speculate as to whether Thomas feared for his safety after seizing the box-cutter. But that kind of speculation is not substantial evidence, and was not enough to support an instruction on imperfect self-defense. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 620 ["'Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense'"].) Consequently, we conclude the trial court did not err by refusing to provide the instruction. We therefore need not, and do not, reach the issue of prejudice.[6]

_____

6       Thomas contends reversal is required due to the cumulative prejudice arising from the asserted evidentiary and instructional errors. This argument fails. We have rejected Thomas's assertion of evidentiary error, determined that the trial court did not commit prejudicial error by refusing to instruct on attempted voluntary manslaughter based on heat of passion, and discerned no error in the court's refusal to instruct on attempted voluntary manslaughter based on imperfect self-defense. Under these circumstances, we find no cumulative prejudice to Thomas and reject his contention that cumulative error in his trial denied

26

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


DAUM, J.*

We concur:



COLLINS, Acting P.J.



MORI, J.

---

him a fair trial and due process of law.  (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

\* Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.

27